THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GLEN A. HOMINICK, Defendant-Appellant.

Second District No. 2—87—1065

Opinion filed December 1, 1988.—Rehearing denied January 11, 1989.

20

Timothy K. Mahoney, of McNamee & Mahoney, Ltd., of Dundee (Charles E. Nave, of counsel), for appellant.

Thomas F. Baker, State's Attorney, of Woodstock, and Immel, Zelle, Ogren, McClain, Germeraad & Costello, of Springfield (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, and Kevin T. McClain, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Glen A. Hominick, was found guilty by a jury in the circuit court of McHenry County of seven counts of delivery of a controlled substance (cocaine) (Ill. Rev. Stat. 1985, ch. 56½, par. 1401(c)) and one count of narcotics racketeering (Ill. Rev. Stat. 1985, ch. 56½, par. 1654(a)). Defendant was sentenced to seven years' imprisonment on each of the seven unlawful delivery convictions and 12 years on the narcotics racketeering conviction, all sentences to be served concurrently.

He raises eight issues: (1) whether the chain of custody of the cocaine was sufficiently proved; (2) whether his motion for a directed verdict at the close of the State's evidence should have been granted where the State failed to prove any weight of certain of the items tested for cocaine; (3) whether his motion for a directed verdict at the close of the State's evidence should have been granted where the State failed to prove him guilty beyond a reasonable doubt of narcotics racketeering; (4) whether the court allowed improper cross-examination of a defense witness; (5) whether the State failed to prove venue as to three of the offenses; (6) whether the jury was properly instructed as to narcotics racketeering; (7) whether the narcotics racketeering statute is unconstitutionally vague; and (8) whether the sentence is excessive and the result of an improper consideration of factors in aggravation and mitigation.

On seven different occasions between July 26 and October 8, 1986, the defendant sold varying small amounts of cocaine, less than 10 grams in each instance, to undercover police. These sales all occurred in different areas of the premises of the Glory Days Bar and Grill in Harvard, McHenry County, Illinois. Further facts necessary to an understanding of the issues raised will be presented prior to analysis of each issue.

## CHAIN OF CUSTODY

The defendant contends the chain of custody proved by the

State's evidence was insufficient to permit admission of State's exhibits Nos. 1 through 7. He points out that the initial handling of the cocaine received from the defendant by Officer Ainsworth and Detective Salgado was careless, there was no testimony as to the condition of Ainsworth's file cabinet or Salgado's briefcase at the times the cocaine was removed therefrom and turned over to McHenry County sheriff's department Detectives Pandre and Lockhart, there was no evidence as to what happened to the white envelope each of Ainsworth's buys were initially sealed in by him, and there was no testimony as to how the items were brought to court on the day of trial. Such evidence, he argues, was insufficient to sustain the State's burden of establishing a reasonable probability that the evidence had not been altered or substituted prior to trial.

The State's position is that the evidence properly was admitted where numerous witnesses identified the items as being the same items produced by the defendant and as being in substantially unchanged condition, and where a chain of possession was established which provided an additional basis for admission of the evidence.

Defendant's contention necessitates a review of the facts surrounding the chain of custody. In the first transaction on July 26, undercover police officer Shawn Ainsworth purchased two white packets containing one-half gram of cocaine each from the defendant for $100 at the Glory Days Bar and Grill in Harvard. Ainsworth left the bar, put the packets in a white business envelope and sealed the envelope. He drove home and put the sealed envelope in a combination file/gun cabinet which he locked with a pushbutton key lock. No one else had a key or access to the cabinet, and he had no other packets of cocaine in the cabinet at that time. He later turned the cocaine over to Detective Pandre. Ainsworth identified People's exhibit No. 1 in court as the two packets which he purchased from the defendant on July 26. He identified them because they had the marking "1/2" on the seal of the packet itself. The packets were in the same condition as they were when he received them and turned them over to Detective Pandre except they had tape and other markings on them.

On cross-examination regarding this incident, Ainsworth testified he did not open the packets to inspect them, nor did he initial or mark the white envelope in which he sealed them. Two other people resided with Ainsworth in his home located in Boone County about three miles from Harvard. The cabinet was his and was a two-drawer gray metal filing cabinet. It was 17 hours later when he turned the still sealed white envelope over to Detective Pandre at a country vegetable stand just off route 47 and Charles Road. People's exhibit No.

1 did not contain a white envelope, and he did not know what happened to the white envelope after he gave it to Detective Pandre.

Detective Pandre identified People's exhibit No. 1 as the two "snow-seals" he received from Ainsworth. Pandre immediately brought them to his office in the courthouse, where there is an evidence room. The packets tested positive for cocaine. He weighed them and secured them in a plastic bag and put them by themselves in a locked evidence locker. He wrote on the clear plastic bag what the contents were and the date he received them and sealed the top with evidence tape. Only he and Detective Ronald Page had keys for the evidence locker. He later turned the plastic bag over to Detective Lockhart. In court, the packets were different from when he received them from Ainsworth in that they had orange tape and some markings on them, and the package was different than when he turned it over to Detective Lockhart in that it had been opened in an area other than the top seal and resealed and there were some other dates on it.

Detective Lockhart identified People's exhibit No. 1 which he received from Detective Pandre. He distinguished its present appearance and the appearance of its contents from their condition when he received them from Pandre. He transported People's exhibit No. 1 to the State police crime lab in Rockford and gave it to forensic scientist James O'Connor. Other than the People's exhibit sticker, it was in the same condition as it was when he received it back from James O'Connor.

On July 31, Ainsworth again was in the Glory Days Bar and Grill and purchased one-half gram of cocaine from the defendant for $50. He put the packet on his person and went to his car, where he put it in a white business envelope, sealed it, took it home, put it in the file cabinet and locked it. The cabinet remained locked at all times, and no one else had access to the cabinet. There were no other drugs in the cabinet. The delivery occurred in McHenry County, Illinois. Ainsworth identified People's exhibit No. 2 at trial as the packet he purchased on July 31. It had a little mark in the right-hand corner on one side which read "1/2." The packet was different than when he turned it over to Detective Pandre the next day, August 1, in that it had clear red evidence tape and writing on it. On cross-examination, Ainsworth stated he did not inspect the packet, but sealed it in an envelope and put it in his own file cabinet. He turned over the white envelope to Detective Pandre 22 hours later.

Detective Pandre testified he received People's exhibit No. 2 from Ainsworth in a white envelope that was not a part of the purchase

but, rather, Ainsworth's own envelope, which Pandre destroyed. When Ainsworth handed him the white envelope, he asked Ainsworth whether the envelope was something he received at the Glory Days Bar and Grill. The envelope may have been licked shut, but he did not recall. He field-tested the substance, secured it in a plastic envelope and put it by itself in a separate drawer in the narcotics evidence locker. Except for some tape on the bottom, tape on the packet, some writing and the exhibit number, People's exhibit No. 2 was in the same condition as when he turned it over to Detective Lockhart. Referring back to People's exhibit No. 1, Pandre could not recall whether the two packets he received from Ainsworth were in a white envelope. Since there was more than one packet, Ainsworth may have put them in a white envelope, but Pandre was not sure.

Detective Lockhart identified People's exhibit No. 2 which he received from Detective Pandre. Other than some distinguishing tape and writing and the exhibit number, it was in the same condition as when he received it from Pandre. After receiving it from Pandre, Lockhart took it to Ed McGill at the State police crime lab. Lockhart described how its appearance differed upon receiving it back from McGill, but otherwise it was in the same condition as when he turned it over to McGill.

Ainsworth again was in the Glory Days Bar and Grill on August 7. He arranged to buy one-half gram of cocaine from the defendant for $50. The defendant went into the kitchen area and came back out with a white packet which he put behind the matches in a matchbook and handed to Ainsworth over the bar. Ainsworth looked inside the matchbook, saw a white packet with a "half" marked on it and put the matchbook on his person. This transaction took place in the Glory Days Bar and Grill in McHenry County. He put the matchbook in a white business envelope, sealed it, took it home and locked it in his file cabinet. There were no other packets or books of matches inside the cabinet on August 7, and no one else had access to the cabinet. He turned the packet over to Detective Pandre later that same day. Ainsworth identified People's exhibit No. 3 as the matchbook and the packet he purchased on August 7. He recognized the little "1/2" indication in the corner written in pen. The packet and matchbook were in the same condition as when he turned them over to Detective Pandre except that the seal of the packet had red tape and writing on it and the matchbook had writing on it. On cross-examination, Ainsworth testified the locked cabinet was in his room.

Detective Pandre identified People's exhibit No. 3 which he received from Ainsworth. The packet was enclosed in a matchbook

which Pandre took from him as being part of the transaction. The matchbook and packet were different than when he received them from Ainsworth due to markings on the matchbook and tape on the packet. Except for the tape on the bottom of the bag, some writing and an exhibit number, People's exhibit No. 3 was in the same condition as when he turned it over to Detective Lockhart. People's exhibit No. 3 was placed by itself in a separate drawer in the evidence locker.

On cross-examination, Detective Pandre said when he received the packet in the matchbook from Ainsworth, he did not recall if they were in a white envelope, but he felt the matchbook was important with regard to the delivery of the substance from the defendant to Ainsworth.

Detective Lockhart identified People's exhibit No. 3, a sealed plastic envelope containing a pack of matches and a folded piece of white paper which he received from Detective Pandre. He described how its appearance differed from when he received it from Detective Pandre and testified he then took it to Ed McGill at the Illinois State police crime lab in Rockford. He described how the exhibit's appearance differed from when he received it back from McGill, but otherwise it was in the same condition as when he turned it over to McGill.

On September 21, Ainsworth again was in the Glory Days Bar and Grill and asked the defendant if he would sell him some more cocaine. The defendant went into the back, came out, put a packet into a matchbook cover and handed it to Ainsworth across the bar. Ainsworth observed a white packet with "½" marked on it inside the matchbook. In his car, he secured the matchbook and white packet in a white envelope. He sealed the envelope when he got home and locked it in his file cabinet. No one else had access to the cabinet, and he had the only keys to the cabinet. The next day, September 22, he turned the packet and book of matches over to Detective Lockhart. Ainsworth identified People's exhibit No. 4 as the packet of cocaine which was inside the matchbook. Over the defendant's objection, Ainsworth testified he took the matchbook out of the white envelope because he was instructed by Detective Lockhart that he did not need the booklet of matches but just the quantity of drug. He recognized the packet by the "½" mark in the corner and testified he sealed the package himself. He knew it was the same package because he initialed the three evidence tapes several times across and also there was some of his writing on the front of it. Except for some additional clear red evidence tape and writing on it, it was in the same condition as when he received it from the defendant and turned it over to Detective Lockhart. Ainsworth testified this transaction took place in

McHenry County, Illinois.

On cross-examination regarding this incident, Ainsworth testified he saw the "seal" (the white packet) inside the matchbook but did not open it. The white envelope remained in the cabinet for about 18 hours; he was not present the entire 18 hours. He called Detective Lockhart, and he told him he did not need the matchbook. Ainsworth opened the white envelope and discarded the matchbook. In his room, he sealed the packet in a clear plastic envelope, zip-locked it and sealed it at the top with three tapes which he initialled on both sides. On redirect, Ainsworth testified he was instructed not to drive back to the sheriff's department on any of the occasions on which he made a buy.

Detective Lockhart identified People's exhibit No. 4 which he received from Ainsworth. He field-tested the evidence, then placed the sample back in the original envelope and sealed it. He kept it in the evidence vault at the sheriff's department until September 26, when he turned it over to Ed McGill at the crime lab. He described the differences in the condition of the exhibit from when he received it from Ainsworth and when he received it back from the crime lab.

McHenry County sheriff's department Detective Ron Salgado testified he went to the Glory Days Bar and Grill located in Harvard on August 21. Pursuant to a prior arrangement with the defendant, Salgado received from him one "snow-seal" packet with "½" marked on it for $50. He put it in his pocket, went back to the bar for a short time, then went to his car. He put the packet in a plastic bag he had in his car and put it in his pocket. When he arrived home, he sealed the bag with tape, initialled it and placed it in a briefcase. He locked the briefcase with a key and kept the key on his person. No one else had access to the briefcase, and he kept the only key for it on his key ring. The packet was picked up by Detective Lockhart approximately a day and one-half later. Salgado did not turn it over to Detective Lockhart immediately because this was a long-term undercover operation which may have been jeopardized had he gone directly to the police station. He identified People's exhibit No. 5 as the item he received from the defendant on August 21 by the initials which he had placed on the tape and the "½" mark on the packet. Except for certain red tape, writing and other initials, Salgado testified the packet was in the same condition as it was when he turned it over to Detective Lockhart and when he received it from the defendant in the Glory Days Bar and Grill.

On cross-examination, Salgado testified he did not taste, test, or sample the contents of the packet. His home is 20 to 25 minutes from

Harvard in Wonder Lake. He testified the evidence locker is one method of securing evidence to prevent tampering. He explained the difference between a controlled buy using an informant and a direct buy, which is how he made the buy from the defendant. He testified he knew the correct way to fold a snow-seal.

Detective Lockhart identified People's exhibit No. 5 which he received from Detective Salgado. He described how its present condition was different from the time he received it from Salgado. He took it into his custody and turned it over to James O'Connor at the State crime lab on September 8, 1986. He described how its condition differed from when he turned it over to O'Connor and when he received it from Salgado.

Salgado next testified he was in the Glory Days Bar and Grill on August 29. He received from the defendant two one-quarter snow-seals for $50. He placed the two packets in his pocket and stayed in the bar area for a short time. As on the 21st, he put the two packets in a plastic bag which he had in his car, placed it in his pocket and drove home. There he taped, initialled, and dated the package, put it in his briefcase and locked the briefcase. No one else had keys to the briefcase, and it remained at his residence for approximately a day and a half before he turned it over to Detective Lockhart. He identified People's group exhibit No. 6 as the plastic bag and two one-quarter snow-seals which he sealed in evidence tape and initialled and dated. Except for some additional evidence tape, writing, dates, and initials, People's exhibit No. 6 was in the same condition as when he turned it over to Detective Lockhart, and the packets were the same as when he received them from the defendant. On cross-examination, Salgado testified he did not sample, taste or test the two packets. There were no marks on the two snow-seals he purchased from the defendant.

Detective Lockhart identified People's group exhibit No. 6 as a sealed plastic envelope containing two white folded pieces of paper which he received from Detective Salgado. He described the condition of the exhibit at the time he received it from Salgado. Both packets field-tested positively for the presence of cocaine. He turned this evidence over to Ed McGill on September 8, and he described its condition at the time he turned it over and the time he received it back from McGill.

Salgado was also in the Glory Days Bar and Grill on October 8. He purchased from the defendant a snow-seal with a "1/2" marked on it for $50 pursuant to arrangements with him on October 4. Inside his car, Salgado placed the snow-seal in a plastic bag he kept in his car

and put it in his pocket. At home, he sealed the bag with tape, initialled and dated it, and put it in his briefcase. He locked the briefcase and placed the key in his pocket. No one else had access to or a key for the briefcase. The next day, he turned the packet over to Detective Lockhart. He identified People's exhibit No. 7 as the package he taped, initialled and dated on October 8 and the snow-seal with the "1/2" marked on it. Salgado testified that a "snow-seal" is a paper that is folded up in a packet form to contain cocaine—"snow"—so that it will not open and the cocaine will not slip out or fall out. He stated that except for some additional writing and some tape on it, the snow-seal was in the same condition as when he received it from the defendant. Salgado testified that all this occurred in McHenry County.

On cross-examination, Salgado testified he opened the packet at home, but never tasted, sampled or tested it. On redirect, Salgado testified he opened all the packets he purchased from the defendant and they all contained white powder.

Detective Lockhart identified People's exhibit No. 7, a sealed plastic evidence envelope, containing a folded paper which he received from Detective Salgado, field-tested and turned over to James O'Connor at the State police crime lab in Rockford. While it was in Lockhart's possession, he kept it in the evidence vault at the sheriff's department in the courthouse. He described the differences in its appearance from when he received it from Salgado, turned it over to O'Connor and received it back from O'Connor.

On cross-examination, Lockhart testified when he went to Salgado's house to get the evidence, Salgado unlocked a briefcase and gave it to him. Later, on re–cross-examination, Lockhart testified Detective Pandre would take the evidence out of his evidence locker, give it to Lockhart, and then Lockhart would place it in the regular evidence room, walk-in safe. Detective Lockhart testified he had the only key to that safe.

James O'Connor was the next witness for the State. O'Connor is a forensic scientist for the Illinois State Police. He testified as to People's exhibits Nos. 1, 5 and 7. He received each of these exhibits from Detective Lockhart. These exhibits were kept by O'Connor in the evidence vault at the laboratory. He described the differences in each exhibit at trial from when he received it and returned it to Detective Lockhart. Each exhibit tested positively for the presence of cocaine.

Edward McGill, a forensic scientist for the Illinois State Police, testified as to People's exhibit Nos. 2, 3, 4 and 6, which were kept in a vault. McGill described the differences in these exhibits at trial from

when he received them and returned them to Detective Lockhart. Each exhibit tested positively for the presence of cocaine.

There are two methods of laying a proper foundation for the introduction of an object into evidence: by identification of the object by a witness or by establishing a chain of possession. (*People v. Holman* (1987), 157 Ill. App. 3d 764, 775.) Both proofs are not required. (*People v. Stewart* (1984), 105 Ill. 2d 22; *People v. Winters* (1981), 97 Ill. App. 3d 288.) Identification of the object by a witness is appropriate when an item possesses unique, readily identifiable characteristics and its substance is relatively impervious to change. (*People v. Irpino* (1984), 122 Ill. App. 3d 767, 773.) "However, if the item is not readily identifiable or if it is susceptible to alteration by tampering or contamination, its chain of custody must be established with sufficient completeness to render it improbable that the original item has either been exchanged, contaminated, or subjected to tampering. [Citations.]" (*Irpino*, 122 Ill. App. 3d at 773.) In establishing a proper chain of custody, the State need not exclude all possibility of tampering but need demonstrate only that the exhibit has not been changed in any important respect. (*Holman*, 157 Ill. App. 3d at 775; *People v. Shiflet* (1984), 125 Ill. App. 3d 161, 178.) "Unless [the] defendant provides actual evidence of tampering or substitution, the State need only establish the stated probability and any deficiencies go to weight and not admissibility of the evidence." (*Shiflet*, 125 Ill. App. 3d at 178.) Moreover, where one link in the chain is missing, but testimony described the condition of the evidence when delivered which matches the description of the evidence when examined, the evidence suffices to establish a sufficient chain of custody. (*Irpino*, 122 Ill. App. 3d at 775.) The admission of such physical evidence at trial is within the discretion of the trial court, whose decision will not be reversed on appeal absent an abuse of that discretion such that the defendant was prejudiced. *Holman*, 157 Ill. App. 3d at 775; *Irpino*, 122 Ill. App. 3d at 773.

Defendant here contends the chain of custody was deficient due to the amount of time Ainsworth and Salgado kept the packets, the lack of testimony as to the condition of Ainsworth's cabinet and Salgado's briefcase upon removal of the packets therefrom, the absence of the white business envelopes in which Ainsworth initially placed the packets, and the lack of testimony as to how the exhibits were brought to the courtroom.

This last contention was not one of the grounds of the defendant's objection to the admission of this evidence at trial, and it is waived where he otherwise specified the grounds for his objection.

(*People v. Pope* (1985), 138 Ill. App. 3d 726, 738, *vacated & remanded on other grounds* (1987), 481 U.S. 497, 95 L. Ed. 2d 439, 107 S. Ct. 1918.) Further, defendant's argument concerning the one missing matchbook cover, although raised at trial, was not presented in his initial brief but only in his reply brief and therefore is waived. 113 Ill. 2d R. 341(e)(7); *People v. Barnett* (1988), 173 Ill. App. 3d 477, 488.

■ Defendant relies primarily on *People v. Woessner* (1971), 132 Ill. App. 2d 58, and *People v. Slaughter* (1986), 149 Ill. App. 3d 183, in support of his argument that the deficiencies he points out rendered the State's evidence of the chain of custody insufficient. Both of these cases have been distinguished in later cases, however, as ones which involved "a complete breakdown" in the State's chain of custody. (See *People v. Irpino* (1984), 122 Ill. App. 3d 767, 776 (distinguishing *Woessner*, 132 Ill. App. 2d 58); *People v. Holman* (1987), 157 Ill. App. 3d 764, 777 (distinguishing *Slaughter*, 149 Ill. App. 3d 183).) There was no such "breakdown" in the chain of custody here, however. Defendant cites no authority which would support his implied contention that the evidence should immediately have been secured in an evidence locker, and Ainsworth and Salgado each testified the undercover nature of the operation required that they not have immediate contact with the police after making a buy. They also each employed a reasonable means of safekeeping of the packets until they could be placed in an official police evidence locker.

It is true that neither Ainsworth nor Salgado testified as to the condition of the cabinet or the briefcase when the packets were removed, but there was evidence that no one except Ainsworth and Salgado had any means of access to the cabinet or briefcase. Further, Ainsworth's and Salgado's testimony as to the condition of the evidence when delivered matched the description of the evidence when it was examined. Assuming *arguendo* the lack of testimony as to the condition of the cabinet and briefcase when the packets were removed is a missing link, where one link in the chain in missing, such testimonial evidence has been held sufficient to establish a continuous chain of custody. (*Irpino*, 122 Ill. App. 3d at 775.) The only evidence of tampering offered by the defendant at trial, besides the missing matchbook which point has been waived here, was the fact of the missing white envelopes. It has been held, however, that in the absence of actual evidence of tampering, such deficiencies in the chain go only to the weight and not the admissibility of the evidence. (*Shiflet*, 125 Ill. App. 3d at 178.) For example, in *People v. Holman*, the court found a missing plastic bag, and the presence of an additional manila envelope, did not destroy the integrity of the evidence or create a tangible

suggestion that the evidence had been altered, substituted or tampered with. (*Holman*, 157 Ill. App. 3d at 776-77.) We conclude the lack of the white envelopes here did not destroy the integrity of the evidence.

Defendant presents no specific argument or citation of authority with regard to his bare assertion there was no evidence as to how the exhibits came to be in the courtroom for trial, nor does he argue the lack of this evidence amounts to a showing of actual tampering or substitution. As such, the lack of such evidence goes only to the weight of the evidence, not its admissibility. (*Shiflet*, 125 Ill. App. 3d at 178.) According to the record, the evidence locker in which the exhibits were stored after testing was located in the same building as the courtroom. We conclude the State's evidence sufficiently proved the chain of custody.

### SPECIFIC WEIGHT OF CONTROLLED SUBSTANCES

Defendant contends the State's evidence failed to prove him guilty as to the offenses which occurred on July 26, August 21, and October 8, 1986, inasmuch as forensic scientist James O'Connor did not testify as to the weight of these exhibits and, thus, the court erred by denying his motion for directed verdict. The indictments against the defendant as to those offenses charged similarly that he committed the offense of unlawful delivery of a controlled substance in that he "knowingly and unlawfully delivered to John Doe less than 10 grams of a substance containing cocaine."

■ The State argues this issue has been waived, and we agree. An election by the defendant to present evidence after denial of a motion for a directed verdict at the close of the State's evidence waives any error in the trial court's ruling on the motion except when he renews the motion at the close of all the evidence. (*People v. Turner* (1984), 127 Ill. App. 3d 784.) The defendant here did not renew his motion at the close of all the evidence, and, contrary to his argument in reply relying on *Turner*, his post-trial motion was not sufficient to preserve the issue. Motions for directed verdict and judgments notwithstanding the verdict are addressed to the sufficiency of the evidence, whereas the motion for a new trial is addressed to the manifest weight of the evidence. (*People v. Rey* (1985), 136 Ill. App. 3d 645, 650-51.) Moreover, an alleged error must be both objected to at trial *and* noted in the post-trial motion. *People v. Howard* (1985), 139 Ill. App. 3d 755.

■ The defendant does not argue the error should be reviewed under the plain error doctrine (107 Ill. 2d R. 615(a)), and no plain er-

ror is evident. As the State argues, defendant was not charged with the delivery of any specific amount of cocaine which would have to be proved as an essential element of the offense, as was the case in *People v. Clutts* (1976), 43 Ill. App. 3d 366 (possession of 50,000 amphetamine tablets), and *People v. Harper* (1985), 135 Ill. App. 3d 846 (possession of 70 grams of a controlled substance), relied on by defendant. The grade of the offense here did not depend on the specific weight of the cocaine in each packet inasmuch as it was less than the minimum amount of the next highest grade felony (10 grams, Class 1 felony (Ill. Rev. Stat. 1985, ch. 56½, par. 1401(b)(2))), thus falling within the Class 2 felony grade offense for *"any other amount* of a controlled or counterfeit substance." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 56½, par. 1401(c).

O'Connor testified he tested the substance in each of these packets and all were positive for the presence of cocaine. Consequently, there was "an amount" of a controlled substance. *Cf. People v. Horton* (1973), 15 Ill. App. 3d 51 (residue amount of heroin sufficient to sustain conviction for possession of narcotics).

## NARCOTICS RACKETEERING

■ Defendant's next contention is that the court erred in denying his motion for directed verdict on the narcotics racketeering charge at the close of the State's evidence where it failed to show he received "income" from a pattern of narcotics activity absent any testimony that he "spent, deposited, or profited in any manner from the monies allegedly delivered at the bar."

The State argues this issue also has been waived because defendant presented evidence after his motion was denied, and, as above, the defendant did not renew his motion for directed verdict at the close of all the evidence, thus waiving the issue. (*Turner,* 127 Ill. App. 3d 784.) Absent plain error, defendant's post-trial motion alone was not sufficient to preserve the issue, and no plain error is evident. On the merits, this same issue was recently decided contrary to the defendant's position in *People v. Arman* (1988), 171 Ill. App. 3d 232.

## CROSS-EXAMINATION

■ Defendant contends it was error for the court to allow the State to inquire of defense witness Dorothy Headley whether she was aware that her half-sister, Diana Hominick, the defendant's ex-wife, had charges pending against her for the same thing as the defendant. Defendant's objection was overruled, and Headley testified she was aware from what her family had told her that Diana and the defend-

ant had charges against them, but she did not know exactly what the charges were. Defendant contends that any possible bias of this witness that properly might have been shown by this evidence was substantially outweighed by the extreme prejudice caused him by its admission. The prejudice identified by the defendant in his initial brief is that he was then forced to call Diana Hominick as a witness and her testimony revealed she owned the bar and was the defendant's ex-wife. His additional argument that this evidence was the only other evidence which tended to corroborate the testimony of the State's two primary witnesses, Ainsworth and Salgado, is a new argument raised for the first time in his reply brief with no citation of authority. Accordingly, that argument is waived. 113 Ill. 2d R. 341(e)(7); *People v. Barnett* (1988), 173 Ill. App. 3d 477, 488.

■ Matters that may reasonably be expected to color the testimony of a witness or cause him to testify falsely are proper subjects of inquiry of any witness by any party. (E. Cleary & M. Graham, Handbook of Illinois Evidence §607.7, at 337 (4th ed. 1984).) The partiality of a witness is subject to exploration at trial and is always relevant in discrediting the witness and affecting the weight of his testimony. (*People v. Gonzalez* (1984), 104 Ill. 2d 332, 337.) Evidence offered to establish interest, bias, or corruption that is remote or uncertain may be excluded. (*People v. Hiller* (1980), 92 Ill. App. 3d 322.) The scope of cross-examination is largely within the discretion of the trial court. *People v. Rogers* (1988), 123 Ill. 2d 487, 507.

■ The State's inquiry here was designed to expose the relationship between the witness, the defendant, and the defendant's ex-wife, the witness' half-sister, the implication being that the relationship may have given rise to a reason for her to testify falsely in the defendant's defense. The fact the witness was related to the defendant through her half-sister was appropriately shown, since the relationship of a witness to a party or interested person may be shown as bearing on the question of possible bias. (81 Am. Jur. 2d *Witnesses* §552 (1976).) Similarly, the witness' business connection with the defendant and his ex-wife at the Glory Days Bar and Grill appropriately was shown to expose her potential bias or prejudice in favor of the defendant. (81 Am. Jur. 2d *Witnesses* §552 (1976).) There was evidence that Headley helped the defendant and her half-sister renovate the bar, set up the actual operation of the bar, trained the defendant in bartending, and worked at the bar occasionally on weekends. Although it does not appear that she had a financial stake as such in the establishment, she clearly had a personal and business interest in its successful operation. The fact the witness' half-sister had "charges

pending against her for the same thing" as the defendant certainly could have been the basis for a motive to testify favorably for the defendant since the charges against Diana Hominick arose out of one of the narcotics transactions for which the defendant was being prosecuted. The witness reasonably could have believed that an acquittal of the defendant could not help but be advantageous to her half-sister's defense against the same charge.

People v. Lashmett (1984), 126 Ill. App. 3d 340, and People v. Charleston (1985), 132 Ill. App. 3d 769, cited by the defendant, are easily distinguished. In Lashmett, the trial court properly refused to allow the defendant to cross-examine a State witness regarding a guilty verdict in Federal court against him where there had been neither post-trial motions nor sentencing in that case and where the defendant never raised the possibility that the witness expected leniency. Consequently, such cross-examination would not tend to show bias or interest. The question in Charleston did not involve cross-examination of a witness designed to demonstrate bias, interest or motive to testify falsely but, rather, the fact that it was improper to introduce as impeachment of the witness' credibility the fact of a proceeding against the witness which did not result in a conviction.

Defendant misstates the facts of People v. Handley (1972), 51 Ill. 2d 229, and that case does not support his argument on this issue. The defendant in Handley sought to show bias on the part of a State witness by evidence of the circumstances of a prior arrest of the witness on an unrelated burglary charge. The State witness had been arrested for the burglary along with one of the defendant's several codefendants who was acquitted. In the burglary charge case, the State witness was released on recognizance while the defendant's codefendant's bond was set at $2,500, and the State witness shortly thereafter implicated the defendant and the others in the cause at bar. Inasmuch as there were no charges then pending against the State witness and the burglary charge had been dropped against both the State witness and the defendant's codefendant, the court found that revelation of the difference in the circumstances of their release on bond, while showing minimal bias on the State witness' part, would have been highly prejudicial to the defendant's codefendant since the jury would have been made aware of his prior arrest. Consequently, it found the trial court did not abuse its discretion in limiting the defendant's cross-examination of the State witness.

Here, Diana Hominick's potential involvement in the October 8 offense could easily have been inferred from Detective Salgado's testimony concerning that occurrence, and the defendant himself ques-

tioned her concerning the charges on direct examination. Although the defendant suggests he was forced to call her after Headley's testimony, she was listed as one of the witnesses he intended to call in his supplemental answer to the State's disclosure motion filed months before trial. Moreover, had defense counsel not inquired of Diana Hominick as to this point, the State likely would have exposed the charge pending against her as a motive for her to testify falsely in favor of her ex-husband inasmuch as they were both charged with delivery of narcotics arising out of the October 8 incident.

We conclude it was not error for the court to allow this cross-examination of defense witness Dorothy Headley.

## VENUE

Defendant contends the State failed to prove venue as to the July 26, August 21, and August 29 offenses because there was no direct testimony that these offenses took place in McHenry County. Defendant's contention is specious. There was evidence each of the offenses took place at the Glory Days Bar and Grill and evidence that the establishment was located in Harvard, McHenry County, Illinois. Proof of venue may be supplied by direct or circumstantial evidence. (*People v. Longoria* (1983), 117 Ill. App. 3d 241, 254.) "[V]enue is proved if there is evidence from which it can be inferred that the crime was committed within the jurisdiction where the prosecution took place." (*Longoria*, 117 Ill. App. 3d at 254.) Venue was proved as to all the offenses.

## NARCOTICS RACKETEERING INSTRUCTIONS

Defendant contends it was error for the court to refuse his tendered instructions Nos. 15 and 16 setting forth the issues the State must prove in order to sustain its burden of proof on narcotics racketeering and defining the word "income." He argues the denial of these instructions left the jury uninstructed as to what it had to find to support a conviction for narcotics racketeering since the word "income" is so pivotal to the meaning of the statute.

There are no Illinois Pattern Jury Instructions (IPI) on the offense of narcotics racketeering. Defendant tendered a non-IPI issues instruction on narcotics racketeering which provided that in order for the State to sustain its burden of proof it must prove "[t]hat a person derived income directly or indirectly from," and then the instruction paraphrased all the subparagraphs of section 4 of the Narcotics Profit Forfeiture Act (the Act). (Ill. Rev. Stat. 1985, ch. 56½, pars. 1654(a) through (d).) His "income" instruction, based on Black's Law Diction-

ary, provided: " 'Income' is defined as the return in money from one's business, labor, or capital invested; gains, profits, or private revenue."

The non-IPI instructions tendered by the State informed the jury in five separate instructions that:

"[E]ffective August 18, 1982, there was in effect in the State of Illinois, Illinois Revised Statues, chapter 56½, section 1654, which states that:

'A person commits narcotics racketeering when he receives income knowing such income to be derived, directly or indirectly, from a pattern of narcotics activity in which he participated.'

'Narcotics activity' means any conduct punishable as a felony under the Illinois Controlled Substances Act.

'Pattern of narcotics activity' means two or more acts of narcotics activity of which at least two such acts were committed within five years of each other. At least one of those acts of narcotics activity must have been committed after the effective date of this act and at least one of such acts shall be punishable as a Class X, Class 1 or Class 2 felony.

*** [D]elivery of a controlled substance, less than 10 grams of cocaine, was a Class 2 felony at the time of the offense (during the period of July 26, 1986 through October 8, 1986).

To sustain the charge of Narcotics Racketeering, the State must prove the following propositions:

First: That the defendant received income; and

Second: That the defendant knew said income to be derived, directly or indirectly, from a pattern of narcotics activity in which he participated.

If you find from your consideration of all the evidence that both of these propositions has [sic] been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that both of these propositions has [sic] not been proved beyond a reasonable doubt, you should find the defendant not guilty."

Supreme Court Rule 451 provides: "[W]henever IPI-Criminal 2d does not contain an instruction on a subject on which the court determines that the jury should be instructed, the instruction given on that subject should be simple, brief, impartial, and free from argument." (107 Ill. 2d R. 451(a).) Defendant's tendered issues instruction not only was complex, confusing and lengthy, it was incorrect inasmuch as the defendant was charged only under subsection (a) of section 4 of the Act. (Ill. Rev. Stat. 1985, ch. 56½, par. 1654(a).) Jury

instructions should not be misleading or confusing, but should fully and fairly inform the jury of the applicable law. (*People v. Prather* (1985), 138 Ill. App. 3d 32.) The determination of whether to give a non-IPI instruction rests within the sound discretion of the trial judge (*People v. Polk* (1986), 143 Ill. App. 3d 698), and a trial court may properly refuse a defendant's proposed jury instruction when there is no evidence supporting the proffered instruction. *People v. Mitchell* (1985), 136 Ill. App. 3d 205.

 As to his tendered "income" instruction, it has long been established that words not specifically defined in a statute are given their ordinary and popularly understood meanings (*Niven v. Siqueira* (1985), 109 Ill. 2d 357) unless to do so would defeat the perceived legislative intent (*John K. v. Board of Education* (1987), 152 Ill. App. 3d 543). Although removal of an essential element of the charged offense from consideration by the jury would be error, if the term in question is in general use and is not a technical term or a word of art, it need not be defined in the absence of anything in the charge to obscure its meaning. *People v. Johnson* (1981), 98 Ill. App. 3d 228; *People v. Agee* (1980), 85 Ill. App. 3d 74.

Defendant's argument suggests there is a difference between "income" and "profits" under the Act and because there was no evidence he spent, deposited or profited from the monies allegedly delivered at the bar, the failure of the court to instruct the jury as to income was error where it might otherwise have found that he did not "profit" from his involvement in the offenses. By the explicit terms of section 2 of the Act, which is the legislative declaration, the stated intent of the Act is "to supplement existing sanctions by mandating forfeiture *of money and other assets generated by narcotics racketeering activities.*" (Ill. Rev. Stat. 1985, ch. 56½, par. 1652.) Certainly the defendant here received money—income—in return for the cocaine he delivered, whether that money represented a "profit" to him or not. We conclude the court did not abuse its discretion in denying his tendered instructions.

CONSTITUTIONALITY OF NARCOTICS RACKETEERING STATUTE

 The defendant contends the narcotics racketeering statute is unconstitutionally vague due to what he perceives is a conflict between the legislative declaration and the statute itself. (Ill. Rev. Stat. 1985, ch. 56½, pars. 1652, 1654.) Specifically, he notes the legislative declaration provides that the statute is directed towards "profits" generated by narcotics racketeering whereas the statute itself provides punishment for "income" received through a pattern of narcot-

ics activities and there is no definition of income provided in the statute.

The State asserts the defendant has waived the issue by failing to raise it below. Alternatively, it argues the defendant does not have standing, and the statute is not unconstitutionally vague.

Defendant has waived the issue. It is well settled that the question of the constitutionality of the statute is properly preserved for review only when it has been raised and passed upon by the trial court (*People v. Myers* (1981), 85 Ill. 2d 281; *People v. Amerman* (1971), 50 Ill. 2d 196; *People v. Coleman* (1983), 120 Ill. App. 3d 851), and the issue may not be raised for the first time on appeal (*People v. Shaw* (1975), 31 Ill. App. 3d 555). It is only where the unconstitutionality of the statute has first been established that it becomes a matter of fundamental justice to apply the ruling to subsequent cases on appeal even though the issue was not raised in the trial court. *People v. Gully* (1986), 151 Ill. App. 3d 795, 798; *People v. Koppen* (1975), 29 Ill. App. 3d 29.

### IMPROPERLY IMPOSED AND EXCESSIVE SENTENCE

Defendant contends the court abused its discretion in sentencing him to nearly the maximum term possible on all the offenses where the record shows there were mitigating factors which the court did not consider. The concurrent 12-year sentence for narcotics racketeering and the seven-year sentences for unlawful delivery of a controlled substance were not an abuse of the court's discretion.

As shown by the record, it is clear the court considered the factors in mitigation which were offered by the defendant but, on balance, found they did not outweigh the very serious aggravating factors against him, including the fact he delivered cocaine on seven separate occasions and, thus, could hardly be viewed as a first-time offender. The court also considered that the defendant expressed no remorse and was the "local dealer" who was always ready and willing to deliver, thus making purchase easy.

The court also heard evidence from the State's witness in aggravation, 19-year-old Penny Schrader, that she bought cocaine from the defendant on 20 occasions before her arrest in August 1986 and conviction in December 1986 for delivery of cocaine. Contrary to the defendant's assertion that Schrader testified these purchases took place at a time after the defendant was arrested and the bar closed, the record shows Schrader corrected herself as to the time period in which the buys were made after initially stating they were made in October and November 1986.

In further aggravation, the State presented the testimony of 30-year-old Richard Lee Peterson that two weeks prior to the sentencing hearing, the defendant, free on bond pending the instant sentencing, "suggested" to him that he (Peterson) "plead the Fifth" and not testify as to the two occasions on which he purchased cocaine from him because he (Peterson) "could get [himself] in trouble." According to the record, the defendant was arrested early in the afternoon just prior to the instant sentencing hearing and charged with unlawful communication with a witness and subornation of perjury as a result of his conversation with Peterson. The question of Peterson's credibility in light of his own upcoming sentencing on a narcotics charge and the State's agreement to recommend two years' probation in exchange for his testimony at the defendant's sentencing hearing was for the court to determine.

A trial judge is accorded broad discretion in the sentencing phase of a trial in order to permit a reasoned judgment concerning the particular circumstances of each case (*People v. Bedony* (1988), 173 Ill. App. 3d 613, 620), and the imposition of a sentence is an abuse of discretion only where the judgment of the trial court is manifestly unjust or palpably erroneous (*People v. Anderson* (1986), 112 Ill. 2d 39). In light of this record, particularly the fact the defendant's criminal disposition was unaffected by his convictions, the court's sentence reflects a reasoned judgment which, as such, will not be disturbed by this court. *People v. Cox* (1980), 82 Ill. 2d 268; *People v. Perruquet* (1977), 68 Ill. 2d 149.

The judgments of the circuit court of McHenry County are affirmed.

Affirmed.

LINDBERG, P.J., and REINHARD, J., concur.