THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FINCH PETTIS, Defendant-Appellant.

Second District   No. 2—88—0281

Opinion filed June 22, 1989.

Will & Briscoe, Ltd., of Waukegan (Thomas A. Briscoe, of counsel), for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers

and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DUNN delivered the opinion of the court:

Defendant, Finch Pettis, was convicted of unlawful delivery of 15 or more grams of a controlled substance (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(a)(2)) and was sentenced to a term of six years' and seven months' imprisonment. He raises the following contentions on appeal: (1) that the trial court erred by denying his motion to quash arrest and suppress evidence; (2) that the trial court erroneously refused to permit his attorney to ask an accomplice during cross-examination about the potential penalties for the charge dropped by the State in return for his testimony; (3) that the State failed to provide adequate proof of the chain of custody for the cocaine that was admitted into evidence; and (4) that he was not proved guilty beyond a reasonable doubt. We affirm.

Defendant's conviction resulted from his alleged participation in a sale of cocaine to special agent Robert Ogden of the Lake County Metropolitan Enforcement Group (LCMEG) at a gas station at the corner of 21st Street and Lewis in Zion on October 1, 1987. Ogden met with other LCMEG agents and a confidential source at about 4:30 p.m. on that date in order to formulate plans for the transaction. The confidential source told Ogden that the purchase would be made at the Zion gas station and that Nelson Booker was one of the individuals involved in the transaction.

Ogden and the confidential source arrived at the gas station at about 5:02 p.m. that same day. They met Booker and another man who Booker identified as Tommy Boyd. At the time there were three cars with LCMEG agents in the vicinity conducting surveillance. Agents Jon Story and Robert Koval were in a car parked on Joppa Street, about one block away from the gas station. Agents Nikos Eliopoulos, Mark Padilla, and Curtis Brame were parked about one-half block south of the station. Agent Syndy Nugent and Detective Owen of the Zion police department were in a church parking lot at the southeast corner of 22nd Street and Lewis.

Booker told Ogden at the gas station that the price for the cocaine would be $1,600. Boyd then stated that he was going to make a telephone call to his source. Boyd returned and told the others that the source would arrive within a short time. The source had not arrived after 20 minutes, so Ogden stated he was hungry and that he had to contact a person throwing a party in southern Lake County in order to tell that person he would be late. He employed this ruse in

order to notify the other agents that the deal might take longer than expected. Ogden gave Booker and Boyd the number of a pager so they could contact him. Ogden then left the scene and met with some of the other agents.

Ogden and the informant returned to the gas station after the meeting. They received a page, contacted the phone number that appeared on the pager, and spoke to Boyd, who told them he had contacted his source and the source would meet everyone at the station. At about 6:19 p.m., Ogden saw Booker and Boyd walking toward his vehicle. Other agents saw Booker and Boyd arrive in the area in a blue Oldsmobile with two other men. These two men stood near the Oldsmobile while Booker and Boyd approached Ogden's car.

The two men informed Ogden that the source would not deal with him directly. Instead, the source would park a short distance from the gas station, and Boyd would retrieve the cocaine from the source's car. Boyd told Ogden that the source would be driving a silver BMW. A little while later, Boyd stated that he saw his man. Ogden looked up and saw a silver BMW turning from Lewis Avenue onto 21st Street. Boyd then said that he had to go meet the man and walked toward the BMW. This occurred at approximately 6:46 p.m.

Defendant was the driver of the silver BMW. He parked the car on Joppa Street, about 30 feet from where Agents Koval and Story were parked. The agents saw a plastic bag containing something white in defendant's right hand. Defendant reached over toward Boyd and his hand went below the dashboard. The agents then saw the bag in Boyd's hand. Boyd put it in the left front pocket of his sweatshirt. Boyd did not actually enter the BMW but instead stood outside it and leaned into it.

Boyd then returned to the gas station and sat in the passenger seat of Ogden's car. Ogden testified that Boyd had been away for about two minutes. Boyd asked Ogden to show him the money and Ogden did so. Boyd then handed Ogden a clear plastic bag which contained a white, powdery, rocky substance. Ogden opened up the plastic bag, smelled the contents, and retied the knot on top of it. He activated a prearranged arrest signal. A few minutes later, some of the other agents appeared and placed Booker and Boyd under arrest. The two men who dropped off Booker and Boyd fled from the scene in the blue Oldsmobile. Agents Story and Koval placed defendant under arrest.

Agent Ogden took the plastic bag to the Zion police department and field-tested the contents. The contents tested positive for the

presence of cocaine. Agent Story weighed the substance while it was inside the bag, and the total weight was 29.3 grams. Ogden transported the bag and its contents to the LCMEG evidence locker, where he turned them over to Agent Padilla, the LCMEG evidence officer. The bag was sealed when Ogden turned it over. Ogden identified People's exhibit No. 1 as the bag and substance given to him by Boyd and stated that, except for certain markings, the bag appeared to be in substantially the same condition as it was when he turned it over to Padilla.

Agent Padilla testified that he and Agent Ogden processed the bag and substance. Both initialed the plastic bag. They then placed it into an evidence bag and sealed it. Padilla, who was the only person with access to the evidence vault, then placed the bag into the vault. He retrieved the bag from the vault on October 19, 1987, and turned it over to Agent Syndy Nugent. The bag was sealed at the time he retrieved it from the vault. Padilla identified People's exhibit No. 1 as the item he retrieved from the vault on October 19. He testified that with the exception of an opening, a sticker, and a piece of tape, it was in substantially the same condition as when he turned it over to Agent Nugent.

Agent Nugent testified that she received People's exhibit No. 1 from Agent Padilla on October 19. The package was sealed when she received it. Nugent delivered it to the Northern Illinois Crime Laboratory that same day. With the exception of an opening in the bag made by defendant's attorney and some notations from the laboratory, Nugent stated that People's exhibit No. 1 was in substantially the same condition as when she took it to the laboratory.

Michael Johnson, a chemist at the Northern Illinois Crime Laboratory, testified that the lab received People's exhibit No. 1 on October 19, 1987, although he did not personally receive it. The exhibit was in a sealed condition when Johnson first saw it on October 27, 1987. Johnson slit the evidence envelope open and removed the plastic bag with white powder. He weighed the contents of the plastic bag and determined that they weighed 27.9 grams. Johnson performed a test on the substance and determined that it contained cocaine. He testified that with the exception of the opening made by defense counsel, some tape and some notations, People's exhibit No. 1 was in the same condition as it was when he received it.

Tommy Boyd testified that Nelson Booker stopped over at his home at about 10:30 a.m. on the morning of October 1, 1987. Boyd had known Booker approximately 10 years. Booker said that he had a friend who wanted to buy an ounce of cocaine, and he wanted

Boyd to get the cocaine. Boyd testified that he was not selling drugs at the time but had done so in the past. He initially declined to participate in the deal. When Booker returned about an hour later, Boyd again declined.

Booker went to Boyd's house a third time that day at about 2:30 p.m., and Boyd agreed to try to help out. Booker set up a meeting with the potential buyer at 4:30 p.m. at the gas station minimart at 21st and Lewis. Booker and Boyd walked over to the gas station at the designated time; Agent Ogden and the informant arrived a few minutes later. After they agreed upon a price for the cocaine, Boyd made several phone calls. He attempted to reach defendant twice, but there was no answer. When Boyd returned, however, he falsely told the others that he had made a connection. The four men waited awhile, and it was then decided that Boyd would go to Waukegan. Ogden stated that he wanted to get something to eat and gave Booker a pager number where he could be reached. A friend of Boyd then drove up in a blue Oldsmobile with a passenger and agreed to drive Boyd to Waukegan.

While the men were driving near defendant's home, Boyd saw an acquaintance walking around. This man gave Boyd the number of defendant's pager. Boyd called the number and, shortly thereafter, received a return call from defendant. Boyd then went to meet defendant at the home of defendant's girlfriend, Cynthia White, in Waukegan.

At first, defendant refused to participate in the transaction. He then changed his mind and agreed to meet Boyd near the corner of 21st and Joppa, about a block from the gas station at 21st and Lewis. Boyd returned to the gas station in the blue Oldsmobile along with Booker and the other two men. The other two individuals parked the Oldsmobile behind the station and remained nearby. Boyd and Booker went over to Ogden and the informant, and Boyd stated that the cocaine was on the way.

After a little while, Boyd saw defendant going east on 21st Street in his silver BMW. Defendant turned on Joppa and parked near the corner of 21st and Joppa. Boyd walked over to defendant's car and opened the passenger side door. They spoke briefly. Defendant placed the package with the cocaine on the car seat. Boyd picked up the package, placed it in the left pocket of his sweatshirt, and returned to the gas station.

At this point, Boyd got into Agent Ogden's car and handed Ogden the cocaine. Boyd testified that he was arrested so quickly after handing over the cocaine that he did not have time to get the

money from Ogden.

Boyd testified that after he was taken to the Zion police station, he wrote out a confession which implicated defendant. Boyd said he changed some of the words in the confession because the man taking it wanted him to use different words and say some things in other ways. Boyd admitted that in a meeting with defendant's attorney, his own attorney, and the prosecuting attorney about a week prior to trial, he stated that the agents told him what to write in the confession. Boyd also admitted that, during this meeting, he stated that he met defendant at Webster Junior High in Waukegan after speaking to him on the phone on October 1, although he testified at trial that he met defendant at Cynthia White's home.

According to Boyd, after his arrest, the LCMEG agents told him if he cooperated, his bond would be lowered and he would get out of jail. Boyd then implicated defendant. Boyd stated that, in return for his testimony, he was permitted to plead guilty to a lesser charge. The trial judge refused to permit defendant's attorney to inquire about the potential range of sentences for the charge that was dropped or the offense to which Boyd pleaded guilty.

Defendant testified that he went to Cynthia White's home at about 4 p.m. in the afternoon on October 1, 1987. He watched Cynthia's two children until she returned home at 4:45 p.m. Defendant and Cynthia then went to a bank and a fruit stand. They returned to Cynthia's home at about 6 p.m. Defendant then received a phone call from Tommy Boyd. Boyd stated that he could pay back $60 defendant had loaned to him. Boyd told defendant to drive up to Zion and park around the corner from the Amoco minimart. Defendant used to live in the area where the minimart was located, and his sister still lived in the area. Defendant parked near the corner of 21st Street and Joppa at about 6:30 p.m. Defendant noticed another car parked nearby and saw one man in the car.

Shortly after defendant parked, Tommy Boyd walked up to the car, opened a door, and got in. Boyd told defendant to hold on a second, and he would be right back with the money. Shortly thereafter, two men from the car parked nearby approached him with guns and placed him under arrest.

Defendant stated that he did not supply Boyd with cocaine on the day in question and never sold cocaine to anyone. Defendant stated that while they were both in jail, he asked why Boyd had implicated him. Boyd said the police told him they would let him off if he implicated defendant. Defendant also testified that Tommy Boyd was not at Cynthia White's home on October 1. White corroborated

defendant's testimony in this respect.

Melvin Pettis, defendant's brother, testified that he had a conversation with defendant and Boyd in a hallway outside a courtroom on November 30, 1987. Pettis asked Boyd if he was going to withdraw his prior statement and make a new statement regarding defendant's involvement in the transaction. Boyd said he was and that he was now going to say defendant went to the scene to pick up $60 he had loaned Boyd. Boyd told Pettis he was now going to say defendant was not involved in the cocaine sale. Pettis testified that he did not suggest this story or the amount of the alleged loan to Boyd.

Tommy Boyd was recalled as a witness by defendant. He acknowledged his conversation with defendant and Melvin Pettis outside a courtroom in November 1987. Boyd testified that during this conversation he said that he owed defendant $60 on October 1, 1987, and called defendant to the scene of the transaction in order to repay him. Boyd also stated during this conversation that defendant had nothing to do with the cocaine sale. Boyd also testified that in a prior conversation with defendant in a holding cell at the jail, they made up the aforementioned story, agreeing that they would claim defendant was near the scene of the drug sale only to recover some money he had loaned to Boyd. According to Boyd, he and defendant had not agreed what amount to use as the figure for this "loan" so Melvin Pettis suggested in the November conversation that they use $60.

The jury found defendant guilty of unlawful delivery of 15 or more grams of a controlled substance. The trial court denied defendant's post-trial motion, and defendant now appeals.

Defendant's initial contention on appeal is that the trial court erred by denying the motion to quash his arrest and suppress evidence. The only evidence which defendant sought to have suppressed in the motion was the cocaine itself. Defendant stated in the motion that the cocaine was a fruit of his purportedly illegal arrest.

■ Evidence must be excluded under the "fruit of the poisonous tree" doctrine if it was discovered by exploitation of illegal police conduct. (*Wong Sun v. United States* (1963), 371 U.S. 471, 488, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417; *People v. Vought* (1988), 174 Ill. App. 3d 563, 571.) If defendant establishes a causal connection between the primary illegality and the alleged fruits of the illegality, the State has the burden of demonstrating by clear and convincing evidence that the challenged evidence was obtained by means sufficiently distinguishable to be purged of the primary taint. (*Vought*, 174 Ill. App. 3d at 573.) In the case at bar, however, defendant has

failed to show any causal connection between his arrest and the cocaine seizure.

■■■ In determining whether the trial court's ruling on a motion to suppress was correct, we may consider evidence presented at trial. (*People v. Scudder* (1988), 175 Ill. App. 3d 798, 801; *People v. Bradney* (1988), 170 Ill. App. 3d 839, 845.) The evidence from the suppression hearing indicates that no cocaine was seized from defendant or his car following his arrest. It is clear from the trial testimony that Tommy Boyd handed the package with cocaine to Agent Ogden voluntarily and that there was no causal connection between the procurement of the cocaine by the State and defendant's subsequent arrest. Within the context of a criminal case, the only remedy for an illegal arrest is the exclusion of evidence resulting from the arrest. (*United States v. Radford* (7th Cir. 1971), 452 F.2d 332, 334.) At the suppression hearing, defendant testified that nothing was seized from him following his arrest and that the only items seized from his car were a few baseball caps. These caps were not introduced into evidence at trial. Even if we assume *arguendo* that defendant was illegally arrested, an illegal arrest is of no consequence when, as here, the police obtain no evidence as a result of the arrest. *Radford*, 452 F.2d at 334.

Defendant next contends that the trial court's refusal to permit his attorney to question Tommy Boyd concerning the potential sentences for the charge which the State dropped in exchange for his testimony and the charge to which defendant pleaded guilty constituted a denial of his sixth amendment right to confront witnesses. This argument has been consistently rejected by Illinois courts in cases involving accomplices who agree to testify in return for a reduction in the charges against them. (See *People v. Roy* (1988), 172 Ill. App. 3d 16, 24-25; *People v. Portis* (1986), 147 Ill. App. 3d 917, 927; *People v. Gibson* (1983), 117 Ill. App. 3d 270, 282; *People v. Lake* (1978), 61 Ill. App. 3d 428, 431-32.) Defendant relies largely upon *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105, a case in which the United States Supreme Court held that the trial court's failure to permit a defendant to cross-examine a witness concerning his juvenile probationary status violated his sixth amendment right of confrontation. 415 U.S. at 318, 39 L. Ed. 2d at 355, 94 S. Ct. at 1111.

As the court noted in *Lake*, the ruling of the trial court in *Davis* effectively shielded the potential bias of the witness from the jury. (61 Ill. App. 3d at 431.) The trial court's ruling in *Lake* did not have that effect since it only prevented defendant from bringing out the

range of sentences for the dropped charge and the charge to which the accomplice pleaded guilty. Defendant was still permitted to expose the potential bias of the witness by eliciting the fact that the State allowed him to plead guilty to a less serious offense and had given him a good deal in exchange for his testimony. 61 Ill. App. 3d at 430.

■ In *Lake* and in the subsequent cases adopting that holding, the rationale behind the limitation imposed upon cross-examination was that it prevented disclosure of the potential penalties facing defendant. (61 Ill. App. 3d at 431.) In the case at bar, the trial judge was motivated by the same concern. Since the trial judge allowed defendant to bring out Boyd's potential bias by eliciting the fact that the State allowed him to plead guilty to a lesser charge in exchange for his testimony, the limitation on defendant's cross-examination was not error. It should also be noted that the trial court's ruling did not prevent defendant from inquiring even further than he did as to the details of the plea agreement between Boyd and the State.

Defendant next argues that the trial court erred by permitting the State to introduce the plastic bag containing cocaine into evidence because the State failed to establish a sufficient chain of custody. In making this contention, defendant emphasizes that no explanation was provided as to what was done with this evidence between the time it was delivered to the crime laboratory on October 19, 1987, and October 27, 1987, the day Michael Johnson tested the contents; that the bag weighed 29.3 grams when it was weighed after his arrest, but the contents only weighed 27.9 grams when Johnson weighed them; and that the day after the bag was ripped in court by defendant's attorney, it was returned to court in a sealed condition.

■■ ■ If an item cannot be readily identified or is susceptible to alteration by tampering or contamination, its chain of custody must be established with sufficient completeness to render it improbable that the item has been contaminated, exchanged, or subjected to tampering. (*People v. Hominick* (1988), 177 Ill. App. 3d 18, 29.) The State is not required to exclude all possibility of tampering in order to establish a proper chain of custody but needs only to demonstrate that the exhibit has not been changed in any important respect (*Hominick*, 177 Ill. App. 3d at 29) and that it took reasonably protective measures since the substance was seized. (*People v. Hermann* (1988), 180 Ill. App. 3d 939, 944.) Unless defendant produces actual evidence of tampering, substitution, or contamination, the State need only establish a probability that the above did not occur, and any deficiencies go to the weight rather than the admissibility of the evi-

dence. (*Hominick*, 177 Ill. App. 3d at 29.) If one link in the chain is missing, but there is testimony describing the condition of the evidence when delivered which matches the description of the evidence when examined, the evidence is sufficient to establish a chain of custody. *People v. Irpino* (1984), 122 Ill. App. 3d 767, 775.

■ Defendant correctly maintains that there is a missing link in the chain because there was no testimony concerning what happened to the exhibit from the time Agent Nugent delivered it to the crime laboratory on October 19, 1987, until the time chemist Michael Johnson examined it eight days later. At trial, however, Nugent testified that the exhibit was in substantially the same condition as when she took it to the laboratory, except for some notations on the bag and an opening made by defendant's attorney. Michael Johnson testified that the exhibit was in substantially the same condition as it was when he examined it except for some notations and tape on the bag and the opening. Since there is testimony describing the condition of the exhibit when delivered by Nugent which matches the description of the exhibit when it was later examined by Johnson, the evidence is sufficient to establish chain of custody under the holding in *Irpino*.

■ Defendant argues that there was evidence of tampering because of the 1.4-gram discrepancy in the weight of the exhibit the first and second times it was weighed and because the exhibit reappeared in court in a sealed condition the day after his attorney ripped open the bag in court. When Agent Story weighed the cocaine, he weighed it while it was inside the plastic bag. Michael Johnson weighed only the contents of the bag, the cocaine itself. Johnson testified that the plastic bag alone could have weighed as much as 1.5 grams. This, in addition to the small amounts of the substance used in the tests performed by Story and Johnson, would account for the weight discrepancy. While defendant states further that the evidence may have been susceptible to tampering because of its reappearance in a sealed condition the day after defendant's attorney tore the bag, there is no actual evidence of tampering or alteration. Such speculative assertions are insufficient to support a claim of tampering. (*People v. Hermann* (1988), 180 Ill. App. 3d 939, 945.) We will not interfere with the trial court's discretion concerning the admission of physical evidence at trial absent an abuse of that discretion. (*Hominick*, 177 Ill. App. 3d at 29.) No such abuse of discretion occurred here.

■■ ■ Defendant's final contention is that the trial evidence was insufficient to support a conviction beyond a reasonable doubt. When a reviewing court is presented with a challenge to the suffi-

ciency of the evidence, the relevant question is, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Collins* (1985), 106 Ill. 2d 237, 261.) We recognize that the testimony of Tommy Boyd, an accomplice, was an important part of the prosecution's case. Although the testimony of an accomplice should be viewed with suspicion, it may be sufficient to sustain a conviction, even in the absence of corroboration. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 44.) Since accomplice testimony carries with it potential weaknesses, such as promises of leniency or malice toward the witness, it must be carefully scrutinized on appeal and should not be accepted unless it carries with it an absolute conviction of truth. *People v. Gnat* (1988), 166 Ill. App. 3d 107, 110.

In *Gnat*, this court reversed defendant's conviction of unlawful delivery of cocaine because it was based on the uncorroborated testimony of an accomplice who had been offered leniency by the State, was an admitted drug user, and who originally denied in his testimony that he had been offered leniency, though he later recanted. (*Gnat*, 166 Ill. App. 3d at 110-12.) This court stated that with the exception of the accomplice's testimony, there was no evidence tying defendant to the drugs. (166 Ill. App. 3d at 111.) We also emphasized that while the testimony of some undercover agents corroborated the accomplice's testimony with respect to certain details and certain events surrounding the crime, it did not corroborate his testimony that defendant was a participant in the offense. 166 Ill. App. 3d at 111-12.

Here, the testimony of Agents Koval and Story tied defendant to the cocaine and corroborated Boyd's testimony that defendant delivered the cocaine to him. The agents saw defendant's car park about a block away from the site of the drug transaction. Boyd then walked over to the car and spoke to defendant. The agents saw a plastic bag containing something white in defendant's hand. After defendant's hand disappeared under the dashboard, they saw the bag in Boyd's hand. Boyd put the bag in his sweatshirt pocket, walked over to Agent Ogden's car and made the cocaine delivery. By contrast, in *Gnat*, the accomplice told the undercover agent he had to meet "his guy Paul" in a bowling alley. Other undercover agents saw the accomplice speak to defendant in the bowling alley shortly before the accomplice delivered the cocaine to the agent posing as a buyer. None of the agents saw anything change hands between defendant

and the accomplice. 166 Ill. App. 3d at 111.

While Boyd's status as an accomplice and his prior, inconsistent statements concerning the events surrounding the crime lead us to view his testimony with great suspicion, we are satisfied that the evidence was sufficient to sustain defendant's conviction beyond a reasonable doubt due to the corroborative testimony of Agents Story and Koval. Accordingly, we affirm the judgment of the circuit court of Lake County.

Affirmed.

REINHARD and McLAREN, JJ., concur.