THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD BYNUM, Defendant-Appellant.

First District (6th Division)    No. 1—92—1176

Opinion filed February 4, 1994.

504

Rita A. Fry, Public Defender, of Chicago (Lynne Hubanks Miller, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Christine Cook, and Katherine S.W. Schweit, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GIANNIS delivered the opinion of the court:

Defendant Richard Bynum was charged on June 27, 1991, by information with possession of 10 grams or less of a controlled substance. (Ill. Rev. Stat. 1991, ch. 56$^1$/$_2$, par. 1402(c).) After trial by jury, defendant was found guilty. Following the denial of defendant's post-trial motion, defendant was sentenced to a prison term of six years. Notice of appeal was timely filed, and we have jurisdiction under Illinois Supreme Court Rule 603 (134 Ill. 2d R. 603).

Defendant raises the following issues for review: (1) whether his lawyer's failure to file a motion to quash his arrest deprived him of a fair trial; (2) whether the trial court improperly denied his request to limit the State from introducing the nature of his prior criminal convictions, should he elect to take the stand; (3) whether the State properly established a chain of custody between the substance found by police in defendant's possession and the substance tested by the police crime lab technician; (4) whether the trial court improperly admitted certain expert testimony relating to a chemical analysis of the substance found in defendant's possession; and (5) whether defendant was denied a fair trial by prosecutorial misconduct.

On May 31, 1991, defendant was arrested by plainclothes officers on South St. Louis Street in Chicago. Two of the officers testified that they saw defendant drop a brown bag in a flower pot immediately af-

ter defendant saw them approaching. The State alleged that the bag contained the controlled substance phencyclidine, or PCP.

Officer Michael McMeel testified that he and his two partners were working the day shift on May 31, 1991. McMeel was driving an unmarked police car when he saw the defendant standing in front of a building. The defendant turned away from the police car, looked over his left shoulder towards the car and dropped a brown paper bag into a nearby flower box. Defendant then walked away from the box at a normal pace.

McMeel pulled up to the curb and the three officers got out of their car. Szura walked over to the flower box while McMeel and Daukus identified themselves as police officers and ordered defendant to stop.

While defendant was detained, Szura recovered the bag and told McMeel, "Sarge, I've got some leaf." McMeel testified that he knew "leaf" to be a street term for PCP. He also stated that defense witnesses Carolyn Collins and Marvin Brandon were not present at the scene of the incident.

At the station, McMeel saw Daukus take seven tinfoil packets out of the brown bag. The evidence was placed in an envelope by Daukus and McMeel. McMeel saw Daukus leave the room with the bag. McMeel was not present when any of the identifying marks were placed on the evidence envelope.

Officer Szura was in the passenger seat while McMeel was driving. According to Szura, defendant had a paper bag in his hand, looked toward the unmarked squad car, started to walk the other direction and dropped the bag. McMeel stopped the car and Szura, who never lost sight of the bag, got out of the car and recovered the bag from the flower bed. There were no other bags in the flower bed. Szura testified that there were two or three other bags in the immediate area.

Szura reached inside the bag and opened one of the tinfoil packets. He testified that the material in the bag was a crushed green plant, but that there was a considerable difference between the substance in the bag and cannabis. Szura did not initial or otherwise mark the bag or packets that he recovered. Szura, viewing defense witnesses Carolyn Collins and Marvin Brandon, also testified that they were not present at the scene of the incident.

Szura testified that he was present when Daukus counted the foil packets, placed them in a plastic envelope, heat sealed the envelope and put the envelope in a safe. Szura did not sign the inventory book although he was present when Officer Daukus filled it out. Szura then went with Daukus as Daukus took the envelope "downstairs."

McMeel cosigned the inventory book but did not go downstairs with Daukus and Szura. Szura identified the envelope he took downstairs with Daukus as People's exhibit No. 1.

Marsha Ross, a police chemist, identified People's exhibit No. 1 as the evidence envelope she received from her supervisor on June 15, 1991. She did not recover the bag from the safe at the police station and did not know the name of the supervisor that gave her the envelope. It was sealed, however, and the inventory numbers on the bag matched those on the inventory sheet. The envelope contained a brown paper bag with seven foil packets of crushed green plant material.

The plant material was tested to establish that it was negative for cannabis. Ross indicated that, as a "trained analyst," she could not rule out the presence of cannabis without testing. On cross-examination, she testified that "I can't really say that [the sample appeared to be cannabis]. I had to analyze it first. We don't make decisions based upon appearance." She testified that, based upon a combination of microscopic and color tests, the substance in the packets was not cannabis.

Ross tested for the presence of PCP using two samples from the packets. Ross testified that she first did a precipitant test to get an indication of whether the substance possibly contained PCP. This test was positive, but insufficient to reach a conclusive decision. Next, Ross performed a spectrum analysis to determine conclusively whether the substance contained PCP. She testified that this test is performed by separating the suspected controlled substance from all other substances in the sample by using an extradition procedure. The results of this test were also inconclusive, however, because the sample was not completely separated from other portions of plant material. On cross-examination she stated that the graph created from the spectrum analysis did not match the "known standard."

Finally, Ross performed a gas chromatograph/mass spectrometer test or GCMS test on a single sample taken from the packets. She stated that the results of this test were conclusive and confirmed the existence of PCP. She stated that this test is done by separating the substances tested via a gas chromatograph/mass spectrometer and then comparing the results to the known standard. She testified that the known standards were part of the built-in controlled substance library which were stored in the GCMS testing device, or were available from books or from tests run on known pharmaceutical samples.

Marvin Brandon testified for the defense and presented a very different version of defendant's arrest than that offered by the State. He stated that he was in the area where defendant was arrested on

May 31, 1991. Brandon saw Bynum talking with Carolyn Collins when the police arrived. Brandon, defendant and another man were all handcuffed by the police. Brandon identified McMeel and Szura as two of the officers that handcuffed them. The men were taken to the steps of a nearby porch. One of the officers walked into a nearby building, with nothing in his hands, and came out with a bag. Brandon and the other man were released and defendant was held. According to Brandon, defendant never had a bag in his hand.

On cross-examination, Brandon admitted that he had been in an elevator with defendant in the courthouse the week of the trial, but denied that defendant told him how he should testify. Brandon testified that he saw Officer Szura in the elevator with them.

It was stipulated that Brandon had a June 28, 1991, conviction for attempted armed robbery.

Carolyn Collins testified that she was also in the area on the day of the incident. She stated that she was on her way to Mt. Sinai Hospital to get a prescription and stopped to talk with defendant. The police then pulled up and Collins testified that they searched her purse. Another officer brought out a paper bag. Collins never saw defendant with this bag. Collins then observed three people being taken up to the porch by police. They were handcuffed.

Collins was also in the elevator with defendant and Brandon two days before she testified, along with Officer Szura. Collins testified that defendant told her only to not lose her temper and to stay calm. Both Collins and Brandon denied that defendant described Officers Szura and McMeel to them.

In rebuttal, the State called Szura to the stand to testify that around 4 p.m. on November 5 he was in an elevator in the criminal court's building when defendant, Collins and Brandon stepped in. He testified that defendant told the two that one officer had glasses and a moustache and another had red hair. Szura testified that he then pointed to his own red hair when the woman looked his way. He testified that she laughed and then the defendant turned and looked at him.

Defendant first argues that when the officers stopped him on the street they illegally detained him. He claims his attorney was ineffective by failing to file a motion to suppress his arrest.

In order to succeed on a claim of ineffective assistance of counsel, the defendant must show that his counsel's representation fell below an objective standard of reasonableness and deprived him of a trial " 'whose result is reliable.' " (*People v. Albanese* (1984), 104 Ill. 2d 504, 525, 473 N.E.2d 1246, quoting *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064.) The

defendant must also demonstrate sufficient prejudice that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Albanese*, 104 Ill. 2d at 525, quoting *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

In this case, Officer McMeel saw the defendant standing in front of a building and, upon seeing the officer, drop a bag into a flower bed. Defendant then began to walk away. McMeel pulled up in front of the building, got out of the car and called out "Police, stop, police." At the time Officer Szura recovered the brown bag from the flower bed, McMeel testified he had already stopped the defendant.

The State concedes that the officers did not have probable cause to arrest defendant when they stopped him. Instead, the State argues that defendant was not "under arrest" until after the contents of the abandoned bag had been examined by the officers and after they had determined that the substance in the bags was probably contraband.

In *People v. Murray* (1990), 137 Ill. 2d 382, 387-88, 560 N.E.2d 309, the Illinois Supreme Court recognized three theoretical tiers of lawful police-citizen encounters. The first tier involves the arrest of an individual supported by probable cause to arrest, without which the fourth amendment prohibition against unreasonable seizures is violated. (*Henry v. United States* (1959), 361 U.S. 98, 4 L. Ed. 2d 134, 80 S. Ct. 168.) The next tier involves the so-called "*Terry* stop," a brief seizure that must be supported by a reasonable suspicion of criminal activity in order to be within the bounds of the fourth amendment. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.) The last tier is commonly known as the community caretaking function or public safety function. This tier involves no coercion or detention by the police, such as when the police investigate vehicle accidents in which there is no claim of criminal liability. *Cady v. Dombrowski* (1973), 413 U.S. 433, 441, 37 L. Ed. 2d 706, 714-15, 93 S. Ct. 2523, 2528.

■ In this case it is clear that defendant was not placed under arrest until after the officers had opened the abandoned brown bag containing the foil packets which smelled of PCP. While defendant was surely not free to leave the scene when Officer McMeel ordered him to stop, the police at that time had a reasonable suspicion of criminal activity sufficient for them to briefly detain defendant. This suspicion was based upon defendant's attempt, upon seeing the police, to dispose of the bag in the flower bed and leave the scene. Indeed, these facts are not unlike the facts of *Terry* itself where the police detained a man who was suspiciously pacing in front of a storefront window.

Because the detention of defendant by police did not violate his fourth amendment rights, any motion to quash defendant's arrest by his counsel would have been futile. Defense counsel is obviously not required to file futile motions in order to provide effective assistance. (*People v. Follins* (1990), 196 Ill. App. 3d 680, 687, 690, 554 N.E.2d 345.) Because we conclude that a motion to quash defendant's arrest would have been unsuccessful, defendant has failed to establish his counsel was ineffective under the standards set out in *Strickland*.

Defendant next argues that the trial court applied an improper standard in denying his *in limine* motion regarding the admissibility of his prior convictions. Prior to trial, defense counsel asked the trial court to rule inadmissible the nature of defendant's prior drug convictions as being "too prejudicial." The common law record indicates that defendant had been convicted four times prior to his arrest by the police, three times on charges relating to the manufacture and distribution of a controlled substance. Defense counsel argued that if defendant were to testify, evidence of the nature of the prior convictions would improperly prejudice his case before the jury. He proposed that the better procedure for impeachment would be to allow the State to ask only how many times his client had been convicted of a felony. The court denied the motion. Defendant's attorney indicated that his client would not testify in light of this ruling.

Although a prior criminal conviction is not admissible to show a defendant's propensity to commit a crime, if the prior conviction is for a felony or other crime involving dishonesty, then the trial court, in its discretion, may allow the conviction to be used to impeach. The trial court must first determine, however, that the conviction's probative value outweighs the danger of unfair prejudice. (*People v. Lawler* (1991), 142 Ill. 2d 548, 563, 568 N.E.2d 895; *People v. Montgomery* (1971), 47 Ill. 2d 510, 516, 268 N.E.2d 695; *People v. Rixie* (1989), 190 Ill. App. 3d 818, 826, 546 N.E.2d 52.) Evidence of a conviction used to impeach a witness is inadmissible if a period of more than 10 years has elapsed since the date of conviction or release of the witness from confinement, whichever is later. *Lawler*, 142 Ill. 2d at 563.

■ We decline to review the question of whether the trial court abused its discretion in failing to grant the defendant's *in limine* motion. In *Luce v. United States* (1984), 469 U.S. 38, 83 L. Ed. 2d 443, 105 S. Ct. 460, the United States Supreme Court considered substantially the same issue as now raised by defendant and held that a defendant must actually testify in order to properly preserve the question of whether his prior convictions are too prejudicial to be

used by the State to impeach his credibility. The Court based its decision upon the fact that the trial court cannot make an intelligent decision of whether the evidence sought to be admitted by the State is overly prejudicial unless it knows the precise nature of the defendant's testimony. (*Luce*, 469 U.S. at 41, 83 L. Ed. 2d at 447, 105 S. Ct. at 463.) The Court also indicated that unless the defendant testifies, an appellate court is handicapped in any harmless-error analysis which might otherwise be dispositive. (*Luce*, 469 U.S. at 42, 83 L. Ed. 2d at 448, 105 S. Ct. at 463-64.) Our supreme court applied the same general analysis in *People v. Whitehead* (1987), 116 Ill. 2d 425, 442-45, 580 N.E.2d 687. Because we agree that an analysis of the question raised by the defendant is not possible without knowing the nature of what defendant's testimony would have been, we conclude that he has waived this issue.

Defendant next argues that the State failed to establish a sufficient chain of custody between the contents of the brown bag defendant dropped into the flower bed and the seven foil packets tested by technician Ross. Evidence of a proper chain of custody is required where physical evidence is not readily identifiable or is susceptible to tampering or contamination. The chain of custody must be sufficiently complete to make it improbable that the evidence has been subject to tampering or accidental substitution. (*People v. Payne* (1993), 239 Ill. App. 3d 698, 607 N.E.2d 375.) In the absence of evidence that the sample has been compromised, the State need not exclude every possibility of tampering or contamination, only that it took reasonable protective measures after the evidence was seized and that it is unlikely that the evidence has been altered. *People v. Reed* (1993), 243 Ill. App. 3d 598, 611 N.E.2d 1343.

Once the State has established the probability that the evidence was not compromised, and unless the defendant shows actual evidence of tampering or substitution, deficiencies in the chain of custody go to the weight, not admissibility, of the evidence. (*People v. Tsombanidis* (1992), 235 Ill. App. 3d 823, 601 N.E.2d 1124.) Thus, even where there is a missing link in the chain of custody, trial courts have properly admitted evidence where there was testimony which sufficiently described the condition of the evidence when delivered which matched the description of the evidence when examined. See, *e.g., People v. Pettis* (1989), 184 Ill. App. 3d 743, 753-54, 540 N.E.2d 1097; *People v. Irpino* (1984), 122 Ill. App. 3d 767, 775, 461 N.E.2d 999.

Defendant first argues that there are sufficient discrepancies in the testimony regarding the nature of the substance in the packets to require the State to exclude all possibility of tampering. Specifically,

he notes that Officers Szura and McMeel testified that the substance in the foil packets at the time of the arrest had a strong odor which they recognized to be PCP. Officer Szura testified that the plant material in the packets appeared different than cannabis. Defendant makes much of the fact that technician Ross testified that the plant substance in the packets had to be chemically tested before she could rule out the presence of cannabis.

■ Defendant's arguments regarding the "discrepancies" in the testimony are without merit. Ross did not testify that the samples she tested had no odor; rather, she merely indicated that she did not test the samples by using her sense of smell. As the State suggests, officers trained to quickly determine the nature of an illicit substance necessarily must employ different and less precise methods in deciding whether an item seized on the street is contraband. In contrast, Ross, as a scientist, is trained to be more precise in her observations and to discount her own subjective, sensory observations. We see nothing in the record to indicate that the substance in the brown bag was not the same substance tested by Ross.

Defendant next argues that there are two missing links in the chain of custody which undermine the State's claim that it took reasonable protective measures to assure the accuracy of its tests. First, he notes that the officer who initialled the sealed evidence bag did not testify at trial. Second, he argues that the chain of custody is broken by the fact that Ross indicated that she received the bag from one of her supervisors who also failed to testify.

Officer Szura, however, testified that he seized a substance he believed to be narcotics after observing defendant discard the brown bag. He observed Officer Daukas heat seal the suspected drugs in an evidence envelope and enter a record of the evidence on an inventory. He saw the envelope numbered and then initialed by the officer. He followed the officer downstairs where he then saw the evidence bag deposited into the evidence safe. He testified that the safe was not something the officers could open, but in fact was only opened by a person from the crime lab who came to pick up evidence. Technician Ross testified that when she received the evidence, it was still sealed in its envelope and contained the same identification numbers and initials as that in the inventory. Both Szura and Ross identified the envelope and its contents at trial.

Because there is no evidence of tampering or contamination, and because the testimony of the technician who tested the evidence is consistent with the testimony of the officers who made the arrest, all the State needed do at trial was to show that it was improbable that the evidence had been compromised. (*Payne*, 239 Ill. App. 3d at 706,

quoting *Pettis*, 184 Ill. App. 3d at 753-54; *People v. Vance* (1979), 74 Ill. App. 3d 446, 449-50, 393 N.E.2d 91.) The fact that Officer Daukus did not testify or that Officer McMeel did not witness the evidence being processed by Daukas does not create a gap in the chain of custody as Officer Szura testified that he witnessed the evidence being processed and ultimately placed in the evidence safe. While the fact that Ross' supervisor did not testify as to removing the evidence bag and delivering it to Ross does create a gap in the chain of custody, this gap is not sufficient to require that the evidence be excluded absent some other indication of mishandling. *Pettis*, 184 Ill. App. 3d at 753-54; *Irpino*, 122 Ill. App. 3d at 775.

Defendant next challenges the trial court's failure to strike the entire testimony of lab technician Ross. In testifying to her conclusion that the State's exhibit No. 1 contained PCP, Ross stated that she relied on the GCMS testing device. She stated that the device separates the sample into its component parts and creates a "fingerprint" graph of the substance which can then be compared to the print-outs of known chemical substances. She stated that, based upon the results of the GCMS testing device, it was her expert opinion that the State's exhibit No. 1 contained PCP.

While defendant does not challenge the sufficiency of the testing procedures used by Ross or Ross' qualifications as an expert, he notes that the graphs created by the testing device were computer-generated and that the graphs of known substances kept in the GCMS testing device represent computer-stored information. (See *People v. Holowko* (1985), 109 Ill. 2d 187, 191, 486 N.E.2d 877 (discussing the distinction between computer-stored and computer-generated data).) He claims that the reference to these graphs by Ross violated the rule against the use of hearsay evidence and that the State failed to lay a proper foundation for Ross' testimony. He claims that Ross' testimony was improperly admitted and that without it there was insufficient evidence to prove him guilty. He claims his conviction must be reversed outright.

Defendant bases his argument on cases discussing the business records exception to the hearsay rule. (See 725 ILCS 5/115—5 (West 1992).) The tangible print-outs of information stored in a computer are admissible under the business records exception to the hearsay rule where it is shown that (1) the electronic computing equipment is recognized as standard; (2) the input is entered in the regular course of business reasonably close in time to the happening of the event recorded; and (3) the foundation testimony establishes that the sources of information, method and time of preparation indicate its trustworthiness and justify its admission. (*Grand Liquor Co. v. Department of*

*Revenue* (1977), 67 Ill. 2d 195, 202, 367 N.E.2d 1238, 1242; see also *People v. Rivera* (1989), 182 Ill. App. 3d 33, 41-42, 537 N.E.2d 924.) In contrast, records generated by the internal operations of a computer such as the results generated from telephone wire-tapping equipment are admissible into evidence under the business records exception upon a lesser showing that the device under consideration was accurate and operating properly at the time the evidence was generated. *People v. Holowko* (1985), 109 Ill. 2d 187, 192, 486 N.E.2d 877.

The State argues that this case has nothing to do with business records and argues that Ross' testimony was properly admitted into evidence under the rule discussed in *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322. In *Wilson*, our supreme court adopted Rule 703 of the Federal Rules of Evidence (Fed. R. Evid. 703). This rule makes clear that an expert such as Ross may testify as to her opinion on facts or data when those facts or data are of a type reasonably relied upon by experts in the particular field. The rule also makes clear that the facts or data relied upon do not themselves have to be admissible in evidence. Unlike the business records exception to the hearsay rule, which allows the admission of hearsay evidence because of its inherent reliability, Rule 703 does not create a hearsay exception; instead, the rule recognizes that when an expert testifies regarding the basis of her opinion, that basis is admitted not for its truth but only for the purpose of explaining the basis of the expert witness' opinion. *City of Chicago v. Anthony* (1990), 136 Ill. 2d 169, 185, 554 N.E.2d 1381; *People v. Anderson* (1986), 113 Ill. 2d 1, 12, 495 N.E.2d 485.

■ We agree with the State that the business records cases cited by defendant are not controlling. As we have noted, there is a distinction between computer records admitted into evidence and the admission of testimony from an expert such as Ross who uses computer-stored or computer-generated data as the basis of her opinion. Because the computer-generated and computer-stored graphs used by the GCMS testing device were not admitted into evidence for their truth (indeed, these graphs were not admitted into evidence at all), this evidence was not hearsay and defendant's hearsay objection was properly overruled.

As a fall-back position, defendant argues that the State failed to lay a proper foundation for Ross' expert testimony. As we have noted, an adequate foundation under Rule 703 requires that the proponent of the expert's testimony show that the facts or data relied upon by the expert are of a type reasonably relied upon by experts in that particular field in forming opinions or inferences. (See *Wilson*, 84 Ill.

2d at 193.) In addition, when expert testimony is based upon an electronic or mechanical device such as that used here, the expert must offer some foundation proof as to the method of recording the information and proof that the device was functioning properly at the time it was used. (*Cf. Payne*, 239 Ill. App. 3d at 709 ("[t]he foundation regarding the weight of a substance is sufficiently proved if there is testimony verifying the accuracy of the scale used"); *Martin v. Thompson* (1990), 195 Ill. App. 3d 43, 46, 551 N.E.2d 1082 (where the court noted the existence of foundation proof that a GCMS testing device used by an expert witness had been checked by the use of an "Autotune" program, and that a "standard run" and a "blank run" had been made by the expert before processing the sample at issue).) Foundation proof is necessary under Rule 703 because the trial court must ensure that the admission of any scientific evidence, including expert scientific testimony based upon a testing device such as that used here, is both relevant *and reliable*. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786.

■ We note that Ross did not testify that the GCMS testing device was a device generally relied upon by experts in her particular field. Neither did Ross explain how the machine was calibrated or why she knew its results were accurate. Ironically, Ross testified in detail as to how the scale that weighed the foil packets was calibrated, even though the weight of the packets was not at issue. The State's failure to establish the necessary foundation proof was therefore sufficient to preclude Ross' testimony from being accepted into evidence under Rule 703—had defendant objected on these grounds. We do not believe, however, that the defendant's objection fairly raised the issue of whether a proper foundation had been laid for Ross' expert testimony under Rule 703.

A party waives his right to appellate review of an alleged error made during trial unless he preserves this right by objecting to the alleged impropriety in a timely manner and by mentioning the specific objection in a post-trial motion. (*People v. Herrett* (1990), 137 Ill. 2d 195, 209, 561 N.E.2d 1; *People v. Enoch* (1988), 122 Ill. 2d 176, 186-88, 522 N.E.2d 1124.) An objection to evidence based upon a specific ground is a waiver of all objections not specified. (*People v. Pope* (1985), 138 Ill. App. 3d 726, 486 N.E.2d 350; *People v. Andrews* (1982), 105 Ill. App. 3d 1109, 435 N.E.2d 706.) The rule requiring defendant to make a specific objection is particularly well suited for application when a defendant argues on appeal that the State has failed to lay the proper technical foundation for the admission of evidence. This is so because a timely and specific objection allows the

State the reasonable opportunity to correct any deficiency in the foundation proof. See *Rivera*, 182 Ill. App. 3d at 43.

Our review of the record indicates that defendant's counsel did not object that Ross' testimony lacked sufficient foundation because Ross failed to indicate that the machine was properly calibrated or that she failed to indicate that the data generated by the GCMS testing device was of the same type reasonably relied upon by experts in her field. Instead, defendant's counsel argued that Ross' testimony would have been inadequate to admit the computer data directly into evidence under the cases dealing with the business records exception. As we have noted, the foundation required by these cases is different from the foundation required under Rule 703. Under these facts we conclude that defendant has waived the argument that the State failed to establish a sufficient foundation for Ross' expert testimony. (*Cf. State v. Cannady* (Mo. App. Ct. 1983), 660 S.W.2d 33 (reaching same conclusion under similar facts).) Nor do we believe that the failure of the State to lay a proper technical foundation under Rule 703 is a violation of defendant's "substantial rights" sufficient to warrant reversal of this case under the supreme court's plain error rule. 134 Ill. 2d R. 615(a).

■ Finally, defendant argues that the prosecutor's questioning of witnesses regarding the high level of narcotics activity in the area where defendant was arrested unfairly prejudiced his case. In addition, he argues that the prosecutor made references during closing arguments to the area where defendant was arrested merely to arouse the prejudices of the jury. We note, however, that the objections raised by the defendant to these questions were sustained by the trial court. This is generally sufficient to cure any error. *People v. Jones* (1992), 153 Ill. 2d 155, 606 N.E.2d 1145.

With regard to the State's closing arguments, defendant complains that the prosecution impermissibly dwelled upon the fact that Officer McMeel and defendant knew one another simply to create the impermissible inference that defendant had a criminal history. A prosecutor, however, is allowed considerable latitude in closing argument as long as his comments are based upon the evidence or reasonable inferences therefrom. (*People v. Evans* (1988), 173 Ill. App. 3d 186, 205, 527 N.E.2d 448.) The fact that defendant and McMeel knew one another was relevant to the central issue of the case of whether the defendant had knowing possession of the PCP. This becomes obvious when it is remembered that McMeel was driving an unmarked police car. The jury could have reasonably inferred from the testimony that defendant only dropped the bag in the flower bed because he recognized McMeel driving the car and because he real-

ized the danger of discovery of the PCP by the police. The fact that McMeel and defendant had known one another was therefore relevant and important to the State's case and subject to fair comment by the prosecutor in closing.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

EGAN, P.J., and McNAMARA, J., concur.