THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. ORION INGRAM, Defendant-Appellee.

Fifth District    No. 5—99—0639

Opinion filed September 13, 2000.

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Gerry Arnold, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Daniel M. Kirwan and Rita K. Peterson, both of State Appellate Defender's Office, of Mt. Vernon, for appellee.

JUSTICE MAAG delivered the opinion of the court:

Orion Ingram (defendant) was indicted for the offense of first-degree murder. Subsequent to a hearing held prior to the trial, the circuit court granted defendant's motion to suppress evidence. The State filed an interlocutory appeal.

The State filed a criminal complaint against defendant on November 16, 1998, for first-degree murder. The court also issued an arrest warrant. On December 11, 1998, an indictment was filed charging defendant with first-degree murder in the death of Aurelious Burris. On August 13, 1999, defendant filed a motion to suppress evidence and a motion *in limine* seeking to preclude the State's introduction of evidence that he attempted to flee at the time that he was arrested. A hearing on the motions was held on August 25, 1999.

At the hearing, now-retired East St. Louis police detective Gerald Crenshaw testified that the victim was attacked and beaten on October 1, 1998. The case was apparently assigned to Crenshaw approximately one week later. In his grand jury testimony, Crenshaw testified that the victim died on October 8, 1998, after being removed from life support.

Crenshaw interviewed Damon Cobin and Gwendolyn Cherry on October 8, 1998. (Cherry was defendant's cousin, and Cobin was Cherry's boyfriend.) Cobin and Cherry told Crenshaw that defendant and his brother, Clarence Guy, came to Cobin's and Cherry's apartment. Defendant was apparently very excited and "hyper." Cobin and Cherry both observed blood on defendant's clothes and on Guy's shoes.

Defendant told Cobin and Cherry that he had beaten up the victim because he had been selling crack cocaine out of the residence of

defendant's grandmother. Defendant also stated that he had struck the victim several times with a tire iron. Cherry said that defendant described the victim's "guts" hanging out of his wound. Defendant repeatedly stated that he knew the victim got his point.

Guy was arrested on November 13, 1998. The next day, he gave Crenshaw a statement regarding the offense. Guy told Crenshaw that after being told that the victim was selling crack cocaine from their grandmother's home, defendant and Guy went to a liquor store for cigarettes. On their way home, they saw the victim sitting in a burgundy car. Defendant confronted the victim and struck him with his fist, knocking him out. Defendant then picked up a wooden board and struck the victim with it several times. After the attack, defendant and Guy went to Cherry's house, where they remained for "awhile."

Guy told Crenshaw where he might find defendant. At Crenshaw's request, Guy telephoned defendant, and Crenshaw spoke with him on the telephone. When Crenshaw asked defendant to come to the police station, defendant initially claimed that he did not have transportation. When Crenshaw offered to give him a ride, defendant stated that he did not wish to talk to him. Defendant also told Crenshaw that he would talk to him when he was ready.

Subsequent to this conversation, Crenshaw asked Guy to show him where he could find defendant. Guy, Crenshaw, and Detective Desmond Williams drove to St. Louis, Missouri, in an unmarked police car. The officers did not have an arrest warrant for defendant. Crenshaw claimed that he believed that he had probable cause to arrest defendant, but he did not approach the State's Attorney's office because it was that office's policy that police officers submit proof beyond a reasonable doubt and, ideally, a statement from the suspect prior to seeking a warrant.

Upon his arrival in St. Louis at the apartment that Guy pointed out, Crenshaw, who did not know that building's address prior to his arrival, used his cellular telephone and attempted to telephone the St. Louis police for assistance. Crenshaw stated that he knew that he did not have jurisdiction in St. Louis and that he needed St. Louis police officers present. Crenshaw said that the battery on his cellular telephone was low and that he lost his connection with the St. Louis police. Crenshaw then telephoned his supervisor and asked her to relay his message to the St. Louis police. She obliged and the dispatcher to whom she spoke told her that Crenshaw had contacted them.

Crenshaw stated that he drove to the rear of the building and stopped. He directed Detective Williams to monitor the front of the

building. Crenshaw testified that since he was awaiting the arrival of the St. Louis police, he did not knock on the door.

Detective Williams testified that while he was standing at the front of the building, he saw defendant climb out of a window on the second floor. The window appeared to be approximately 10 feet or more above the ground. When Williams saw defendant place one foot and his head out of the window, Williams announced his office and ordered defendant to come down. Defendant said something, climbed back into the room, and closed the window. Williams stated that he assumed that Crenshaw had knocked on the door before defendant began climbing out.

Crenshaw stated that while he was waiting for the St. Louis police to arrive, he heard Williams say that someone was trying to come out of the front window. Crenshaw heard Williams tell defendant to come down. A few seconds later, Crenshaw saw defendant attempting to leave the building by the rear door. Crenshaw arrested him. A few seconds later, the St. Louis police arrived and Crenshaw turned defendant over to them. Crenshaw stated that he never knocked on the door, rang the doorbell, yelled out to defendant, or did anything of that sort.

Crenshaw, Williams, defendant, and the St. Louis police all returned to the police station. Defendant signed a waiver of extradition and was taken to Illinois.

Crenshaw explained that when he left for St. Louis, he had no intention of arresting defendant. Instead, Crenshaw wanted to interview defendant. Although defendant had told Crenshaw over the telephone that he did not wish to speak with him, Crenshaw did not believe that he had to give up trying to obtain an interview with a suspect in a murder case. Crenshaw claimed that he contacted the St. Louis police as a precaution, in order to "cover" himself.

After hearing arguments, the circuit court denied defendant's motions to exclude evidence of his flight.

On August 27, 1999, defendant filed a motion to quash his arrest and to dismiss his indictment. On September 15, 1999, a hearing was held on the motion, and the circuit court evidently treated the motion as a motion to reconsider its previous ruling.

From the beginning of the hearing, the assistant State's Attorney announced that the State was conceding that defendant's arrest in St. Louis by Illinois officers should be quashed because the officers did not have jurisdiction to make the arrest and the circumstances did not fall into any exception, such as fresh pursuit or a citizen's arrest, for an extraterritorial arrest. The State argued, however, that defendant was not prejudiced by the extraterritorial arrest because no evidence

was obtained following the arrest, such as a confession or the murder weapon.

The defense called Sandra Muckensturm, who was Crenshaw's supervisor on November 14, 1998. Muckensturm testified that the State had requested that she prepare a report on February 11, 1999, regarding Crenshaw's cellular telephone call to her on November 14, 1998. In her report, Muckensturm stated that Crenshaw told her that he had called the St. Louis police for assistance in making an arrest if the suspect was present. The report also states that Crenshaw and Williams were going to St. Louis in an attempt to locate defendant. When Muckensturm spoke with the detectives prior to their departure for St. Louis, they did not tell her they were going to arrest someone.

At the close of Muckensturm's testimony, the circuit court made a finding, at defendant's request, that his arrest was illegal and ordered it quashed. The circuit court denied defendant's motion to dismiss the indictment.

The State argued that the evidence of defendant's flight should be admissible at trial because defendant's attempt to flee occurred before the officers attempted to arrest him. The State argued that defendant's flight precipitated the arrest because it caused Crenshaw to make the arrest before the St. Louis police officers could arrive. The State also argued that defendant's arrest was not contemporaneous with defendant's flight because defendant reentered the house and attempted to leave through the back door. Hence, the State argued that there was no causal connection between the evidence of flight and the unlawful arrest.

The circuit court stated that there was no clear-cut demarcation between defendant's arrest and his attempt to flee. The court said that the presence of the police officers prompted defendant's flight; hence, the circuit court reversed itself and granted defendant's motion. The circuit court ruled that the State could not introduce evidence of defendant's attempt to flee.

The State filed a timely notice of appeal. The State certified that the suppression of evidence of defendant's flight substantially impaired the State's ability to prosecute the case.

The State claims that the circuit court erred in granting defendant's motion to suppress evidence of his flight because defendant's attempt to flee occurred prior to the unlawful arrest.

Initially, we note that a reviewing court will not disturb a circuit court's ruling on a motion to suppress evidence unless the ruling is manifestly erroneous. However, when the issue is purely a question of law and the circuit court's determinations of the credibility of the witnesses are not at issue, the standard of review is *de novo*. See *People v. Ciesler*, 304 Ill. App. 3d 465, 470, 710 N.E.2d 1270, 1274 (1999).

In this case, the issue is a question of the circuit court's interpretation of the law. The circuit court ruled as a matter of law that evidence of defendant's flight was so intertwined with the illegal arrest that the flight evidence had to be suppressed. The credibility of the witnesses was not an issue because only the arresting officers and their supervisor testified at the hearing. Defendant did not testify. Hence, our review in this case is *de novo*.

The State's sole issue in this appeal is whether the circuit court erred in granting defendant's motion to suppress evidence of his flight where defendant's attempt to flee occurred prior to the unlawful arrest.

Defendant initially contends that this appeal should be dismissed on the basis that the circuit court's pretrial ruling did not suppress evidence but merely limited the evidence that the State could present. We disagree.

■ Supreme Court Rule 604(a)(1) (145 Ill. 2d R. 604(a)(1)) allows an interlocutory appeal by the State of a *pretrial* suppression order whenever the prosecutor certifies to the circuit court that the suppression substantially impairs the State's ability to prosecute the case. See *People v. Young*, 82 Ill. 2d 234, 248, 412 N.E.2d 501, 507 (1980). The State's right to appeal prior to trial includes the right to appeal pretrial rulings excluding evidence, without regard to its nature, when the State certifies that the exclusion of the evidence substantially impairs the State's ability to prosecute the case. See *People v. Hatfield*, 161 Ill. App. 3d 401, 405, 514 N.E.2d 572, 574-75 (1987). For purposes of the State's right to appeal prior to trial, no distinction exists between pretrial orders suppressing evidence and pretrial orders excluding evidence. Only when the State is appealing a *midtrial* ruling by the circuit court does the reviewing court consider whether the ruling suppressed evidence, which is appealable, or merely excluded evidence, which is not appealable. See *Hatfield*, 161 Ill. App. 3d at 405, 514 N.E.2d at 574-75.

Defendant relies on *People v. Drum*, 307 Ill. App. 3d 743, 718 N.E.2d 302 (1999), *appeal allowed*, 187 Ill. 2d 577, 724 N.E.2d 1271 (2000), for his argument that the State may not appeal an order granting a defendant's motion *in limine*. We need not address the *Drum* decision, however, because the court's reasoning in *Drum* was based on the fact that the State was appealing a ruling by the circuit court denying a motion *in limine* by the *State* that sought the admission of evidence. Hence, *Drum* does not apply to an appeal such as this one where the *defendant* was the one that filed the motion *in limine*.

■ In this case, the State is appealing a pretrial ruling precluding the admission of evidence, and the State has certified to the circuit

court that the suppression of the evidence substantially impairs the State's ability to prosecute the case. Hence, we have jurisdiction of this case.

Defendant claims that if this court has jurisdiction of the appeal, his attempt to leave the apartment by a 10-foot-high window was not evidence of flight because there was no evidence that he was aware that he was a suspect. Defendant also claims that, even if he knew that he was a suspect, it was the officers' presence that prompted his flight and the State should not be allowed to profit from the officers' allegedly illegal actions. We disagree.

As we previously stated, the State conceded that defendant's arrest in St. Louis by police officers from Illinois must be quashed because the Illinois officers had no jurisdiction to make an arrest in Missouri. See *People v. Every*, 184 Ill. 2d 281, 285, 703 N.E.2d 897, 899 (1998). According to *Every*, an officer may go to another state to seek and collect evidence. *Every*, 184 Ill. 2d at 286, 703 N.E.2d at 899.

■ It is important to note, however, that an illegal arrest has no legal consequences when no evidence was obtained as a result of the arrest. See *People v. Pettis*, 184 Ill. App. 3d 743, 751, 540 N.E.2d 1097, 1103 (1989). Stated another way, when no evidence is obtained as a result of the illegal arrest, there is nothing to exclude. See *People v. Brumfield*, 100 Ill. App. 3d 382, 387, 426 N.E.2d 1012, 1017 (1981). In this case, the State represented to the circuit court that no evidence was obtained from defendant following the unlawful arrest.

In *Brumfield*, the court stated that the purpose of the exclusionary rule is to prevent the State from profiting from evidence that has been unlawfully obtained; "it does not reach backward and taint information that was in official hands prior to any illegality." *Brumfield*, 100 Ill. App. 3d at 388, 426 N.E.2d at 1017. In fact, evidence that the police have already gathered is not subject to suppression as a result of *subsequent* illegal conduct on their part. See *Pettis*, 184 Ill. App. 3d at 752, 540 N.E.2d at 1103; *People v. Durgan*, 281 Ill. App. 3d 863, 868, 667 N.E.2d 730, 733 (1996).

■ In the instant case, it is clear that the evidence that the circuit court ordered suppressed was evidence that defendant attempted to flee by climbing out the front window of the building. These actions by defendant occurred *prior* to any attempt by the police officers to arrest him and did not follow from an unlawful arrest. At the time that defendant attempted to jump out of the window, the police officers had done nothing unlawful and were in a place where they had a lawful right to be.

Defendant's initial flight and arrest were separated in time by several seconds. Defendant reentered the house upon seeing Williams.

Defendant closed the window, fled downstairs to the door at the rear of the building, and was arrested upon emerging from that exit. Hence, a review of the record shows that defendant's illegal arrest clearly followed and was not contemporaneous with defendant's initial attempt to flee.

Defendant also contends that his attempt to climb out the window and leave by the back door of the building were not evidence of flight because there was no evidence that he realized that he was a suspect or that he knew police officers were standing outside the building. The record shows, however, that prior to going to St. Louis, Crenshaw and Guy telephoned defendant. Both talked with defendant and Crenshaw asked defendant to come to the police station. Hence, it is clear that defendant knew that the police wanted to talk to him regarding the victim's murder.

A review of the record also shows that Crenshaw, Williams, and Guy—who was still under arrest and seated in the backseat of an unmarked police car—all went to St. Louis. Although Crenshaw parked the police car behind the apartment building where Guy indicated that defendant was staying, defendant attempted to flee through a window at least 10 feet above the ground on the front of the building.

We can only presume that defendant saw the unmarked police car outside the building and saw his brother in the backseat of the car. As a result of talking with Guy and Crenshaw earlier, defendant realized that Guy was with police officers, and he attempted to flee through a window on the front of the building. A trier of fact would certainly be entitled to believe that defendant was attempting to flee. We also note that after defendant was ordered to come down, he reentered the house and attempted to leave by the rear door. Therefore, we find no merit to defendant's argument in his brief that he "may simply have been leaving his home, however strangely."

Finally, defendant argues that the State should not be allowed to use evidence of his flight after police prompted the flight by their presence at his building. Defendant fails to note, however, that the Illinois officers were certainly in a place where they had a lawful right to be and were merely awaiting the arrival of the St. Louis police. The officers had not knocked on the door of defendant's apartment or otherwise attempted to contact defendant prior to his climbing out the window. The suppression of evidence of defendant's flight would not serve any public policy of deterring improper police conduct.

Based upon the foregoing analysis, the circuit court erred when it essentially ruled that the exclusionary rule can apply backward in time to exclude evidence that was obtained prior to the illegality.

Hence, we reverse the circuit court's order suppressing evidence of defendant's flight since defendant's attempt to flee occurred prior to the unlawful arrest.

Reversed and remanded.

HOPKINS and KUEHN, JJ., concur.