Nos. 2--06--0689 & 2--06--0690 cons.        Filed:  3-17-08

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 05--CF--2916 |
| MARCUS V. BALTIMORE, | ) ) | Honorable Grant S. Wegner, |
| Defendant-Appellant. | ) | Judge, Presiding. |

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 05--CF--2916 |
| MARCUS V. BALTIMORE, | ) ) | Honorable Grant S. Wegner, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE BOWMAN delivered the opinion of the court:

On February 1, 2006, defendant, Marcus V. Baltimore, was charged with the December 2005 burglary of One Stop, a convenience store.  Prior to trial, an adverse ruling by the trial court led the State to file a certificate of impairment pursuant to Supreme Court Rule 604(a)(1) (210 Ill. 2d R. 604(a)(1)) and to pursue an interlocutory appeal to this court.  The trial court's decision not to allow a videotape and various photographs to be introduced at trial forms the basis of the State's appeal.

The State also moved to continue the detention of defendant pursuant to Supreme Court Rule 604(a)(3) (210 Ill. 2d R. 604(a)(3)) during the pendency of its appeal. Although the trial court did not find compelling reasons to keep defendant detained, it did order defendant to report to court services on a weekly basis until the appeal was resolved. Defendant appeals this decision by the trial court. On this court's motion, the appeals were consolidated. For the following reasons, we dismiss both appeals for lack of jurisdiction.

## I. BACKGROUND

### A. Admissibility of Photographs and Videotape

The burglary at One Stop occurred after business hours on December 20, 2005. Although there was no eyewitness to the incident, One Stop's "multiplex" surveillance system captured the offender in the store. Later that day, Aurora police officer Chad Kubis and others viewed the recorded images of the burglary.

On June 8, 2006, defendant filed a motion in limine requesting that the court prohibit Officer Kubis from testifying about what he observed on the surveillance tape. The grand jury testimony indicated that Officer Kubis stopped defendant about six hours after the burglary because defendant's appearance and jacket looked similar to the offender's. Because Officer Kubis did not observe the crime while it was being recorded on the surveillance system, however, defendant argued that the best-evidence rule barred his testimony about the contents of the surveillance tape. Instead, defendant argued, the best evidence rule required that the surveillance tape itself be authenticated and admitted into evidence.

The same day, the State filed a motion in limine to admit photographs as authenticated under the "silent witness" theory. In its motion, the State explained that One Stop employed a "multiple surveillance system used to capture multiple still images from multiple cameras." Although recorded

images of the incident were captured on a "VHS tape" (videotape), the recorded images could not be viewed on a traditional VCR and a television. Rather, "multiplex equipment" was required to view the recorded images. As a result, the State hired a private company to record "five[1] of the captured photographs on a digital format" that was then used to print "photographs on paper." The photographs extracted from the surveillance tape depicted the offender in a striped jacket. The State sought to introduce the photographs under the "silent witness" theory, which allows the admission of such evidence without testimony of a witness if there is sufficient proof of the reliability of the process that produced the evidence.

At the hearing on the motions, the State explained that the recorded images from One Stop's multiplex system were not captured on a surveillance tape that could be played on a traditional VCR. Defense counsel disagreed, stating that the surveillance tape could be played on a traditional VCR, although the images would appear at a rapid rate. Defense counsel argued that there was the possibility of slowing down the images on the surveillance tape so that they could be viewed clearly. The court reserved its ruling, subject to the State's ability to lay a proper foundation for the photographs and/or the videotape.

On June 12, defendant filed a second motion in limine to bar the State from introducing the photographs. The motion stated that, contrary to the State's position, the surveillance tape was not "still images from multiple cameras" or "captured photographs." Instead, the surveillance tape was "live-action video in broken up sequences that in continuous action depict[ed] the offender's actions in the store at the time" of the incident. Defendant stated that, in one of the sequences, the offender could be seen moving about the lottery ticket area and then heading toward the exit. According to

---

[1]In fact, the State sought to introduce six photographs.

defendant, the "five frozen images" chosen by the State did not depict the entire sequence of events or the offender's general build and physical characteristics. Defendant argued that presenting only a few images, rather than the "entire recorded sequence," would be prejudicial and misleading because the jury would not be allowed to make its own determination regarding the characteristics of the offender. Defendant maintained that the best-evidence rule and the completeness doctrine required the State to present the surveillance tape rather than the photographs. Defendant took the position that the State had the capability of either using multiplex equipment to play the tape or converting the tape into another format capable of being viewed on a computer monitor.

The court conducted a hearing on defendant's motion that day. The court noted that the photographs the State sought to introduce were recorded beginning at 2:44:56 a.m. and ending at 2:45:13 a.m. Both parties agreed that the incident occurred during that window of time. Defendant argued that identity was an issue at trial and that the surveillance tape itself was the best evidence because it showed the offender moving. The State responded that defendant's concern was supported not by the best-evidence rule but by the completeness doctrine, and the State conceded that it selected certain frames from which to derive the photographs. The State explained that all of the photographs came from the camera behind the counter at One Stop:

"Every frame that included this figure inside the store from a very specific camera, the camera behind the countertop, a photograph of that frame was created, and then two frames before the first appearance of the figure, so two frames without this individual, and the one frame after the individual has entered and left, one frame with the individual missing; and so that's how the State made the decision to create these images."

The court noted the various times of the photographs: photograph one at 2:44:56 a.m.; photograph two at 2:44:57 a.m.; photograph three at 2:44:59 a.m.; photograph four at 2:45 a.m.;

photograph five at 2:45:02 a.m.; and photograph six at 2:45:13 a.m. It observed that there were time intervals without corresponding photographs between photographs two and three and between photographs four, five, and six. However, the surveillance tape contained images for every moment during the relevant time frame. According to the court, the State could not select "just a portion" of the photographs from the entire surveillance tape. Under the completeness doctrine, the jury had a right to see the entire surveillance tape before the State could introduce the six photographs. The State's options were either to obtain the proper equipment to watch the surveillance tape or to create photographs for every image recorded between 2:44:56 a.m. and 2:45:13 a.m. The court reiterated that its ruling presumed that the State would be able to lay a proper foundation for the photographs.

The parties appeared in court on June 16, and the court corrected its previous ruling: it was not the completeness doctrine, but the best evidence rule, that prevented the State from introducing the photographs. The State explained that playing the surveillance tape on a traditional VCR would show the images at a fast rate of speed. However, the company that created the photographs had a machine that was able to slow down the images, meaning that the company's machine showed images that did not appear when the surveillance tape was played on a traditional VCR. Defense counsel pointed out that Officer Kubis's report contained "a great deal of details" of what the surveillance tape showed, which counsel was not able to observe when she viewed the surveillance tape on a VCR. The court reserved its ruling, stating that the jury needed to see the recorded images in the same format that Officer Kubis originally viewed them.

On June 19, the State moved for a continuance so that it could procure a means to present the surveillance tape "in both video and single frame format." The State explained that it had learned that Officer Kubis would testify that, when he originally viewed the surveillance tape on One Stop's multiplex equipment, he saw "aspects of it in video format." Currently, the State did not have the

equipment to play the surveillance tape in video format, but it was working on obtaining One Stop's equipment. One Stop objected to the idea because it did not want to be without a surveillance system, but the State was going "to revisit that." The court granted the motion to continue.

The court conducted a status hearing on June 28. The State explained that One Stop preferred that the State not bring in One Stop's equipment, because there was the possibility that it would be taken into evidence by the appellate court if the case were appealed. In an effort to avoid bringing in the equipment, the State suggested using another videotape (videotape 2), which was created by the "technical individual" who had installed One Stop's multiplex equipment. According to the State, this individual was able to make videotape 2 from the images that appeared on the surveillance system, and videotape 2 could be played on a traditional VCR. Defense counsel viewed videotape 2 and admitted that it had more frames than the original tape. Nevertheless, both parties agreed that frames were still missing and that videotape 2 did not show at least one thing of significance that Officer Kubis had included in his report. The State advised the court that Officer Kubis had not yet viewed videotape 2, and the case was continued.

The parties appeared for a final trial management conference on July 6. The State informed the court that Officer Kubis had viewed videotape 2 and that the images in videotape 2 were unaltered from the images he remembered viewing on One Stop's multiplex system. However, defense counsel argued that images were still missing from videotape 2 and that it did not show everything in Officer Kubis's report:

"Officer Kubis *** wrote [in] his report that he was able to look at the surveillance video, the video showed at 2:45 on 12-20-05 the glass door getting shattered by the large bricks, then a male black wearing a blue jacket with a white stripe on each sleeve entered the shattered door, then grabbed the lottery machine and disassembled it. The male black

grabbed several instant lottery tickets and stuffed them in some sort of bag. The subject then exited the store, going out the shattered door.

Judge, that is his report of what he saw and what the video showed. I've discussed this with the State's Attorney. I don't think there's a disagreement that what they have so far in their ability to play it doesn't show all that. They now state that if they slow it down long enough, they can see the white stripe on the sleeve. But the bricks coming in the shattered door, the disassembling of the lottery machine, among other things *** I don't believe are shown in the tape they have now."

The court concluded that a multiplex system was required to play the surveillance tape so that every image or frame could be seen. Despite the State's best efforts, it had not been able to create a videotape that duplicated the exact number of frames that would be available under the multiplex system. The court reasoned that the jurors needed to be able to watch the surveillance tape as if they were watching it at One Stop. Otherwise, the jury would be given the impression that the State had selected whatever images it wanted and that the images that the State "had not copied [were] what [defense counsel] needed for her defense."

On July 7, the State filed an additional motion in limine to admit videotape 2. The motion stated the following. On the day of the burglary, One Stop employee Shyan Prakash Sanghvi, along with police officers, viewed the surveillance tape on One Stop's multiplex system. Sanghvi also viewed videotape 2 and described it as an accurate reflection and reproduction of the original videotape. Sanghvi's attached affidavit indicated that he was familiar with and operated One Stop's surveillance system.

At a hearing that day, the State advised the court that it was not going to be able to bring in the multiplex equipment to play the original surveillance tape; One Stop's equipment was "not going

to be able to be brought into court." The State indicated that one option was for the jury to go to One Stop to view the surveillance tape on its multiplex system. Alternatively, the State argued, videotape 2 was admissible because it contained the same number of frames as the original tape played on One Stop's multiplex system. The State had learned from Officer Kubis that, when he and the others first viewed the surveillance tape on One Stop's multiplex system, they had paused specific frames. The State explained that, consistent with Officer Kubis's initial viewing, it was possible to pause images on videotape 2. The court then asked if, without the pauses, videotape 2 would play the images at the same speed as the multiplex system. The State indicated that it had not made that comparison. The court inquired, "So if I'm watching both [videotape 2 on a VCR and the original surveillance tape on multiplex equipment] at the same time, there is absolutely no difference?" The State responded, "No, that's not true."

Defense counsel responded that the images on videotape 2 still appeared at a fast pace. If the State had the ability to slow the images down, then it was not using a traditional videotape or VCR, as alleged. Defense counsel reiterated that Officer Kubis's report contained things not seen in videotape 2. The State countered that Officer Kubis saw things in the frames that led him to form conclusions, which he included in his report; the State was not necessarily agreeing that the conclusions were what the images reflected. The State also responded that it was impossible to know the speed at which Officer Kubis watched the images on the multiplex system, because that system could be manipulated to play at a high or low rate of speed. The speed at which Officer Kubis viewed the images depended on the operator of the system, and Officer Kubis informed the State that the operator had paused specific images. Recognizing that the speed could be manipulated on a frame-by-frame basis, the State clarified:

"[W]hat can't be lost is the time-lapse nature of it. The speed at which it moves is the speed at which it moved on the original as well. The images that were seen, were seen specifically because the individuals were able to pause their specific machine."

The court concluded that, based on the State's candor, it could not say that videotape 2 was an accurate reflection of the original, which was what was required. According to the court, the State "needed to be in a position to be able to tell the jurors this is what everybody saw at the time they ran it through the multiplex." Otherwise, the jury would have the impression that the State was able to edit it or produce it in a fashion that did not conform to various reliability factors. The court advised the State that it could file a motion requesting that the jury view the images on One Stop's multiplex system.

On July 10, 2006, the State filed a certificate of impairment and a notice of appeal, alleging that the court's decision barring the admission of the photographs and the videotape substantially impaired its ability to prosecute the case.

### B. Motion for Continued Detention

The same day, the State moved for the continued detention of defendant under Supreme Court Rule 604(a)(3). At the hearing on the motion, the State argued that defendant's criminal history, which included, among other things, robbery, attempted robbery, and vehicular invasion, contained an aspect of violence. In addition, because defendant was eligible for Class X sentencing, the State argued that he was a flight risk. These circumstances, according to the State, constituted compelling reasons for his continued detention or being held to bail. Defense counsel responded by first challenging the State's certificate of impairment. According to defense counsel, the trial court's decision to bar the photographs and videotape did not equate to suppressing evidence; the court "only ordered that the evidence that still exists and is available to the State must be presented to the jury."

The court agreed with the State that its ruling on the admissibility of the evidence was the same as a suppression, meaning the State could appeal under Rule 604(a)(1). The trial court further noted that, absent compelling reasons, defendant had the right to unconditional release. Determining that the State failed to establish compelling reasons, the court ordered defendant's immediate release, but stated that "[a] condition of that will be that he'll have to report to Court Services once a week." Defense counsel asked the court what basis it had to order defendant to report to court services once a week. The court responded:

> "I think, more importantly, there is nothing preventing me from doing it. And I don't care how they establish it, but under the circumstances when you balance everything and looking at the factors, I think I still have the right to have this Defendant check in once a week, and that, in balance, certainly should be a consideration he would be happy to do."

## II. ANALYSIS

### A. State's Appeal

The State contends that the trial court erred by barring the introduction of videotape 2 and the photographs derived from the surveillance tape. However, we first must address defendant's request to dismiss the State's appeal for lack of jurisdiction. Defendant argues that the substantive effect of the trial court's order did not suppress the evidence the State sought to introduce, but "merely impacted the manner in which the evidence would be presented." As defendant points out, the trial court did not exclude the original surveillance tape, and it ruled that the photographs would be admissible on the condition that the State showed the jury the original surveillance tape. Thus, defendant argues, there was no suppression of evidence as required under Supreme Court Rule 604(a)(1) and no basis for an interlocutory appeal.

Nos. 2--06--0689 & 2--06--0690 cons.

Supreme Court Rule 604(a)(1) provides: "In criminal cases the State may appeal *** from an order or judgment the substantive effect of which results in *** suppressing evidence." 210 Ill. 2d R. 604(a)(1). For purposes of the State's right to appeal prior to trial, there is no distinction between pretrial orders suppressing evidence and pretrial orders excluding evidence. People v. Ingram, 316 Ill. App. 3d 319, 324 (2000). It is the substantive effect of a trial court's pretrial order, not the label of the order or its underlying motion, that controls appealability under Rule 604(a)(1). People v. Drum, 194 Ill. 2d 485, 489 (2000). "When an order prevents information from being presented to the fact finder, evidence is suppressed and the State may appeal that order." People v. Kruger, 327 Ill. App. 3d 839, 843 (2002). The issue of jurisdiction, which involves the interpretation of Supreme Court Rule 604(a)(1), is subject to de novo review. Drum, 194 Ill. 2d at 488.

According to defendant, People v. Truitt, 175 Ill. 2d 148 (1997), dictates the conclusion that we lack jurisdiction in this case. In Truitt, the State relied on a laboratory report, rather than the testimony of the chemist who prepared the report, to show that the subject matter was a controlled substance. Truitt, 175 Ill. 2d at 149-50. However, the statutory authority for the State's reliance was declared unconstitutional by the trial court. Truitt, 175 Ill. 2d at 150. The State appealed the interlocutory order directly to the supreme court under Rule 604(a)(1). The State took the position that the trial court's order was automatically appealable because the State had certified that the suppression substantially impaired its ability to prosecute the case. Truitt, 175 Ill. 2d at 152. While the supreme court stated that it would not second-guess a prosecutor's good-faith evaluation of a suppression order's effect on his case, it also stated that, before that principle even comes into play, the threshold determination is whether a pretrial ruling constitutes a suppression order within the meaning of Rule 604(a)(1). Truitt, 175 Ill. 2d at 152. In making this assessment, the supreme court concluded that the order in Truitt did not have the effect of suppressing evidence, because the order

-11-

would not prevent any facts or opinions from being presented to the jury. Truitt, 175 Ill. 2d at 152. Instead of relying on a piece of paper, the State would have to present testimony from an actual witness. Truitt, 175 Ill. 2d at 152. Because the sole impact of the order was on the manner in which the information would be presented to the jury, the supreme court concluded that the order could not be reasonably viewed as a suppression. Truitt, 175 Ill. 2d at 152.

In Drum, the supreme court reiterated its holding in Truitt:

"This court in Truitt concluded that the State could not appeal from a pretrial order regarding how it would be required to prove that certain material was an illegal controlled substance. The Truitt court reasoned that the pretrial order did not prevent any information from being presented to the jury. Rather, the sole impact of the order was on the means by which that information was presented." Drum, 194 Ill. 2d at 492.

We agree with defendant that Truitt controls the outcome here. This is not a case where the trial court prevented information, in this case surveillance footage, from being presented to the jury. Rather, the State was not allowed to present the information in the manner it wished, because, as the trial court found, the State had not been able to create a videotape that was an accurate reflection of the original surveillance tape. The State simply could not say that the images on videotape 2 appeared the same as on the original surveillance tape. For this reason, the State was left with the option of either having the jury view the surveillance tape at One Stop or issuing a subpoena for the multiplex equipment. While the State "hopes" that it will not have to pursue one of these routes, there is no evidence that either option is unavailable. Because the interlocutory order does not suppress evidence but merely impacts the manner in which the information is presented to the jury, the State has no right to appeal the order under Rule 604(a)(1). We therefore dismiss the State's appeal for lack of jurisdiction. See Truitt, 175 Ill. 2d at 153.

Nos. 2--06--0689 & 2--06--0690 cons.

## B. Defendant's Appeal

Defendant's sole argument is that the trial lacked authority to impose any conditions on his release, such as ordering him to report to court services on a weekly basis, once it found no compelling reasons to keep him detained. In other words, defendant argues that Supreme Court Rule 604(a)(3) entitled him to immediate and <u>unconditional</u> release. The State counters that this court lacks jurisdiction to hear defendant's appeal.

Supreme Court Rule 604(a)(3) states as follows:

> "<u>Release of Defendant Pending Appeal</u>. A defendant shall not be held in jail or to bail during the pendency of an appeal by the State *** unless there are compelling reasons for his or her continued detention or being held to bail." 210 Ill. 2d R. 604(a)(3).

The rule favors release. <u>People v. Wells</u>, 279 Ill. App. 3d 564, 567 (1996). When the State seeks interlocutory appeal of an adverse order, the State must restore the defendant's freedom unless it can establish compelling reasons to override the rule's mandate. <u>Wells</u>, 279 Ill. App. 3d at 567. "Generally, it is anticipated that defendants will enjoy complete freedom during a delay occasioned by interlocutory appeal." <u>Wells</u>, 279 Ill. App. 3d at 567.

In contesting jurisdiction, the State argues that neither Rule 604 nor any other rule or statute authorizes review of the trial court's order. See <u>People v. Beaty</u>, 351 Ill. App. 3d 717, 722 (2004) (there can be no review of an interlocutory order in the absence of a statute or a rule specifically authorizing it). According to the State, requiring defendant to report weekly to court services is not the same as continued detention under Rule 604(a)(3), and it is not the same as a condition of bail under Rule 604(c)).[2] Instead, the State characterizes the weekly check-in requirement as "more akin

_____

[2]Supreme Court Rule 604(c), entitled "Appeals from Bail Orders by Defendant Before

-13-

to a notice to appear," which is not the equivalent of bail or recognizance.  See People v. Eblin, 114 Ill. App. 3d 891, 893 (1983) (a notice to appear is not the equivalent of bail or recognizance; the purpose of the notice is to get persons into court without the necessity and inconvenience of an immediate arrest).  As a result, the State avers that this case does not fall within the ambit of Rule 604 or any other rule permitting defendant's interlocutory appeal.

Defendant acknowledges that the trial court could have ordered him to report to court services as a condition of his bail bond.  See 725 ILCS 5/110--10(b)(1) (West 2004) (the trial court may order as a condition of bail bond that the defendant report to such agency as the court may direct).  However, defendant does not claim that the weekly check-in requirement constitutes a condition of bail, because, once the court ordered his immediate release under Rule 604(a)(3), there was no bail bond to which such a condition could be attached.  In other words, defendant did not follow the procedure to appeal in Rule 604(c) because he does not rely on Rule 604(c) to establish jurisdiction.  Instead, defendant argues that this court has jurisdiction to review "a condition imposed upon what was supposed to be his unconditional release under Rule 604(a)(3)" by virtue of the power this court acquired when the State invoked Supreme Court Rule 604(a) to seek interlocutory review of an adverse ruling.

---

Conviction," allows a defendant to appeal from an order "setting, modifying, revoking, denying, or refusing to modify bail or the conditions thereof."  210 Ill. 2d R. 604(c).  Rule 604(c) sets forth limited and specific procedures for invoking that right, and this court does not have jurisdiction to review such an interlocutory order unless such procedural requirements are followed.  People v. Albitar, 374 Ill. App. 3d 718, 721 (2007).

Defendant's position was expressly endorsed in People v. Beaty, 351 Ill. App. 3d 717 (2004), in which the court reasoned:

"Our power to address pleas for freedom under Supreme Court Rule 604(a)(3) is a part of the power we acquire when the State invokes Supreme Court Rule 604 in order to seek our interlocutory review of an adverse ruling made by a circuit judge. *** Obviously, a determination of whether compelling circumstances justify detention in the face of a standard that favors freedom is not a determination confined to circuit judges. ***

For these reasons, we believe that we have jurisdiction to address the defendant's motion for release under Supreme Court Rule 604(a)(3)." (Emphasis added.) Beaty, 351 Ill. App. 3d at 723.

Beaty appears to piggy-back jurisdiction of the defendant's appeal on the State's right to seek an interlocutory appeal under Rule 604(a)(1). Assuming arguendo that Beaty's rationale for jurisdiction is sound, it affords defendant no relief here, given our determination that we have no jurisdiction to review the State's appeal under Rule 604(a)(1). Obviously, defendant cannot establish jurisdiction by virtue of the State's interlocutory appeal under Rule 604(a)(1) if the State had no right to appeal in the first place. We also note that defendant's appeal of the condition imposed under Rule 604(a)(3) is rendered moot by our dismissal of the State's appeal.

### III. CONCLUSION

For the foregoing reasons, we dismiss both appeals for lack of jurisdiction.

Appeals dismissed.

CALLUM and GILLERAN JOHNSON, JJ., concur.